433 So.2d 1242 (1983)
Nicholas CONTOS and Anne Contos, His Wife, Appellants,
v.
Evalyn LIPSKY, an Individual, Appellee.
No. 82-120.
District Court of Appeal of Florida, Third District.
June 21, 1983.
Rehearing Denied July 18, 1983.
*1243 Koppen & Watkins and George J. Lott, Miami, for appellants.
Katz, Rollnick & Squitero and Neil P. Linden, Miami, for appellee.
Before SCHWARTZ, C.J., and HENDRY and DANIEL S. PEARSON, JJ.
DANIEL S. PEARSON, Judge.
In 1957, the Contoses leased certain land and a restaurant located thereon known as Gallaghers to Evalyn Lipsky.[1] The lease was for a thirty-year term. It contained an option to renew for an additional twenty years and, as well, an option to purchase to be exercised during the last ten years of the initial term, that is, between 1977 and 1987.
In 1960, certain improvements and additions to the building were made. The cost of these improvements and additions was borne by the lessee in the form of additional annual rent equal to ten per cent of the improvements until paid. In 1962, the parties entered into a second addendum to the lease. Under this addendum, the term of the lease was extended an additional twenty years to 2007, the rent to be paid during the extended term was increased to $16,500 per year, and the lessee became immediately obligated to pay  in addition to taxes, assessments, and personal property and liability insurance already being paid by her  the cost of insuring the premises against fire and windstorm.
In 1965, the lessee sublet the premises to one Sloane, who continued operating the restaurant until 1975 under this sublease. During that period, Sloane paid rent to the lessee of approximately $35,000 per year and made physical improvements to the property at a cost of more than $100,000, which improvements were to, and did, revert to the lessee at the end of Sloane's subtenancy. In 1977, the lessee entered into a new sublease of the premises with a company known as Promaxrimin, Inc. This sublease was for a term of slightly more than seventeen years with an option to extend the term to 2007, that is, the date upon which the underlying Contos-Lipsky lease would terminate. The sublease to Promaxrimin called for it to pay rent to Lipsky of $80,000 per year and assume all of Lipsky's obligations in respect to taxes, assessments, and insurance. Thus, by the late 1970's, it was apparent that Mrs. Lipsky's leasehold estate had measurably increased in value over the years, while the leased fee estate of the Contoses had measurably decreased in value.[2]
In 1981, Mrs. Lipsky exercised her option to purchase the property under that provision of the lease which reads:
"The Lessees shall have the option to purchase the leased premises anytime between the 20th and 30th year of this lease; that the purchase price is to be based on the true market value at the time of exercising the option; that the true market value shall be determined as provided in ... paragraph 17 above." (emphasis supplied).
Paragraph 17, in turn, reads:
"The Lessees and the Lessors each shall select a registered real estate appraiser and the two appraisers shall select a third real estate appraiser for determining the *1244 true value of the land and building; that the amount so agreed upon by the said three appraisers shall be considered as the purchase price for subject property."
The owners, contending that the true market value[3] of the property is its value unencumbered by the twenty-six years remaining on the lease, sought a declaratory judgment to that effect. After a non-jury trial, the trial court rejected the owners' contention and entered a final judgment (1) declaring that the true market value of the leased premises is its value encumbered by the lease, (2) adjudging that value to be $172,000,[4] and (3) awarding the owners interest from the date of the lessee's notice of exercise of the option to purchase. The owners appeal from the court's determination of the true market value; the lessee cross-appeals from the court's award of interest.
Whether the true market value of the property is its value unencumbered by the lease or its value encumbered by the lease turns on the question whether the leasehold estate was merged into the fee when the lessee exercised her option to purchase. The parties agree that the once inflexible common law rule  that is, that whenever a greater estate and a lesser estate coincide in the same person without any intermediate estate, the lesser estate merges into the greater  has given way to the rule that equity will prevent or permit a merger as will best serve the purpose of justice and the actual and just intent of the parties, whether express or implied. See Matter of Herring's Estate, 265 N.W.2d 740 (Iowa 1978); Evans Products Co. v. Decker, 52 A.D.2d 991, 383 N.Y.S.2d 457 (N.Y. Sup. Ct. 1976); Waite Lumber Co. v. Masid Bros., Inc., 189 Neb. 10, 200 N.W.2d 119, 74 A.L.R.3d 320 (1972); Browning v. Browning, 23 Tenn. App. 338, 132 S.W.2d 359 (1939); William P. Rae Co. v. Courtney, 250 N.Y. 271, 165 N.E. 289 (N.Y. 1929). See also Jackson v. Relf, 26 Fla. 465, 8 So. 184 (1890); Annot. 143 A.L.R. 93 (1943). Thus, the issue for our determination is whether the trial court abused its discretion when, in applying these equitable principles, it found that the lessee's tenancy was not merged in the fee either at the time of the exercise of the option or as of 1987, when the initial term of lease was to terminate.
Since, as we have already noted, merger will be permitted or prevented in accordance with equitable principles, it is of no significance that the true market value necessarily had to be arrived at prior to the actual closing of the sale and delivery of the deed. Although the lessee contends that merger is legally impossible until the fee and the tenancy actually unite at closing, prior to which the true market value could be ascertained only by taking into account the encumbrance of the then-existing lease, this contention is in obvious derogation of the concededly applicable rule of equity concerning merger. Thus, courts which have addressed the like contention have, where merger was otherwise justified, found a unity of the greater and the lesser estates prior to the actual transfer of the deed, see, e.g., Sid Farber Hempstead Corp. v. Buckley, 65 Misc.2d 237, 317 N.Y.S.2d 30 (N.Y.Dist.Ct. 1970) (upon acceptance of option to buy contained in a lease, option became binding contract of sale and tenant became purchaser in possession); Paullus v. Fowler, 59 Wash.2d 204, 367 P.2d 130 (1961) (status of tenant changed to that of purchaser upon exercise of option contained in lease); Pitman v. Sanditen, 626 S.W.2d 496 (Tex. 1981) (same), and where merger was inequitable, found no such unity, see, e.g., William P. Rae Co. v. Courtney, 165 N.E. 289 (owner's acceptance of option and attempt to have proper consideration fixed in accordance with agreement did not merge leasehold estate in the fee); Northwest Television Club, Inc. v. Gross Seattle, Inc., 96 Wash.2d 973, 634 P.2d 837 (1981) (implying *1245 that vendor-vendee relationship not created until closing of transaction).
We turn, then, to the applicable equitable principles.
"When a mortgage on lands and the equity of redemption in the same lands have become united in the same person, ordinarily the mortgage is merged,  in other words, ceases to be an incumbrance,  and the owner will hold the lands with an unincumbered title, if there be no other mortgage or lien. But this is not always and necessarily the result. Whether it is or not, depends upon the intention of the person in whom the interests are united, and that intention is to be determined by his declarations at the time, or, in the absence of these, by his interests, as shown in the condition of things then existing, or by the attending circumstances. When there is no evidence of the intention of the owner in uniting the legal and equitable estates in himself it is proper to presume that he intended that effect which is most beneficial to him." Jackson v. Relf, 26 Fla. at 467-68, 8 So. at 185.
These same principles are equally applicable in the case of the lesser estate of a leasehold and the greater estate of a fee.
"Whether in equity there is a merger of a lesser estate in a greater ... is largely a question of the intention of the parties, to be gathered to a great extent from the situation of the parties and the surrounding circumstances.
... .
"In the absence of an expressed intent, equity will look for and ascertain it from all the circumstances surrounding the parties and the transaction. If it appears to be against the interest of the party acquiring both estates to have a merger take place, then equity will presume that it was his intention that there should not be a merger." William P. Rae Co. v. Courtney, 165 N.E. at 290.
In the case at hand, we first observe that there is a total absence of expressed intent concerning merger; neither the lease between the parties nor its addenda contain any statement by the parties that they intended either that the leasehold and fee merge or not. Next, there is no evidence in the record from which an intent to merge or not can be implied. In the absence of evidence showing an express or implied intent, we must presume that the lessee (the party acquiring both estates) intended the result most beneficial to her, that is, no merger.
The expenditures made by the lessee and her subtenants for improvements had, along with obviously favorable economic conditions, increased the rental value of the property. The fixed rental of $16,000, which the lessee was obliged to pay, was $64,000 less than she was able to earn by subletting the property. Thus, it is clear that the lessee had a valuable assignable interest in the property, and equally clear that if the lessors were to sell the property subject to their unfavorable lease, the sale price would be measurably reduced by the encumbrance of the lease. A merger of the leasehold estate would result in a loss to the lessee of the value of her profitable annual fair return for the length of the unexpired term. Were merger to be permitted, the lessee would have to pay as much for the premises as any stranger to the lease transaction and lose the value of her lease and the improvements made in reliance on the lease. On the other hand, the owners would receive for their property in 1981 that which they would be entitled to receive only after the lease expired.
While the appraisers in the case at hand differed on the ultimate figure, they agreed that the present worth of the owners' future earnings from rent ("the income stream") plus the present worth of the owners' reversionary interest constituted what an investor would pay for the property in 1981. That this figure falls well below the value of the property unburdened by the lease is simply a function of the owners having saddled the property with an uneconomic long-term lease. As one appraiser stated below:

*1246 "Q Now, when you refer to a burden of the lease, which is a term all of us have used, what does that mean, Mr. Dilmore?
"A It means that at some point a lease has been imposed and if the contract rent, of course, is below the current market rent or economic rent, then a positive leasehold estate is created, and if the rent is in excess of current market rent, a negative leasehold estate has been created, and I have seen instances of both.
"Q In this particular case there is in evidence both the lease, which you examined, showing its rent at $16,000 per year and the increase for the 20-year extension, $16,500 rent ... per year, and the sublease that was in effect, showing a rent of $80,000 per year. Does that create the situation of a positive leasehold estate?
"A Yes.
"Q That is the contract rent, the rent that Mrs. Lipsky was paying to Mr. and Mrs. Contos, is less than the price which the property could be rented?
"A Right.
"Q That creates a favorable benefit to the tenant?
"A Yes.
"Q If the contrary were the case, that is if Mrs. Lipsky were paying more to the Contos[es] than she could in a fair market rent the property for to a subtenant, would that create a positive benefit to the landlord?
"A It creates a negative leasehold interest which accrues to the leased fee interest, as to the lessor's interest."
It thus clearly appears that it would be against the interest of the lessee, the party acquiring both estates, to have a merger take place. That being the case, and in the absence of any evidence showing a contrary intention, it is proper to presume that it was the lessee's intention that there be no merger. Jackson v. Relf, 8 So. 184; William P. Rae Co. v. Courtney, 165 N.E. 289. The analysis of the court in William P. Rae Co. v. Courtney is persuasive here:
"Whether a lease is a burden and an incumbrance of such a nature as to diminish the value of the fee depends upon whether the rent reserved is more or less than the annual value of the premises. It appears from the testimony of real estate experts in this case that the rent reserved in the lease, $2,000 a year, was $4,000 a year less than a fair return on the market value of the property, which was $100,000, and that the burden and incumbrance of the lease was, therefore, more than $30,000, as the lease had sixteen years to run. The expenditure of $41,348.71 by the plaintiff and its assignor on improvements had increased the rental value of the premises. The plaintiff had a valuable interest in the premises which it could have sold and transferred. If the lessors had desired to sell the premises subject to the lease, they would have been obliged to deduct from the market value of the property the amount of the incumbrance of the lease.
"The acceptance of the option by the plaintiff, and its attempt to have the `proper consideration' fixed by agreement or arbitration, did not merge the leasehold estate in the fee.
... .
"To permit a merger of the plaintiff's leasehold estate would result in a loss to it of $30,000, the value of the unexpired term of the lease of sixteen years. To permit a merger under such circumstances would be contrary to justice and equity. It would require the plaintiff to lose the value of its lease and pay as much for the premises as a third party would have to pay. Its option would be worthless and the improvements which it had made in reliance thereon would be lost." 165 N.E. at 290-91.
We think these same equitable principles prevent a merger of the leasehold and the fee in 1987. While it is true that initially the lessee had a mere option to extend the lease for an additional twenty years to 2007, that option had been exercised in 1962, and the lease, at an increased rental agreed upon by the parties, had been extended to 2007. Since the lessors had an enforceable right to receive rent from the *1247 lessee during the twenty-year period from 1987 to 2007, a fifty-year lease had come into being when the option to extend the lease was exercised. Contrary to the lessors' suggestion, this is not a case of the lessee benefiting by having the true market value of the property arrived at by reducing it by an additional twenty-year lease encumbrance that could never come into being. The additional twenty-year encumbrance, fully binding on both parties, was in being as of 1962. We will not undo the lessors' improvident contract. Tampa Drug Co. v. West Drug Stores, 112 Fla. 331, 150 So. 786 (1933); Steiner v. Physicians Protective Trust Fund, 388 So.2d 1064 (Fla. 3d DCA 1980); Florida Sportservice, Inc. v. City of Miami, 121 So.2d 450 (Fla. 3d DCA 1960).
Turning to the lessee's cross-appeal, we reject her contention that the trial court erred in awarding interest to the lessors on the sale price as of the time of her exercise of the option to purchase. As the expert testimony so clearly indicates, the true market value, whether encumbered or unencumbered by the lease, was capable of ascertainment by well-established standards of value, see Florida East Coast Railway Company v. Hill, 233 So.2d 845 (Fla. 3d DCA 1970), and although there may have been some differences in the appraisers' testimony the very agreement of the parties to accept the average of the appraisals, see n. 4, supra, is a telling acknowledgment that the standards of value are well accepted.
Accordingly, the judgment under review is affirmed.[5]
HENDRY, Judge (concurring).
I concur in the legal views expressed by Judge Pearson and in the result.
SCHWARTZ, Chief Judge (dissenting).
It sometimes happens that judges, probably out of a sense of compulsion to give periodic evidence that they went to law school and learned a lot of complicated things there, decide a case upon a rationale discernible only to a select group of the legal cognoscenti instead of upon an analysis of the realities of the situation which any person of affairs would grasp at once. See Alonso v. Fernandez, 379 So.2d 685 (Fla. 3d DCA 1980) (Schwartz, J., dissenting), receded from, McHale v. Farm Bureau Mutual Ins. Co., 409 So.2d 238, 240 (Fla. 3d DCA 1982). In my judgment, that is what has happened here. The point of this case does not "turn on" the intricacies of the abstruse and deservedly obscure doctrine of merger of estates, but rather and simply *1248 upon what the parties meant by the option to purchase provision of their lease. It states, again very simply, but also very specifically, that the tenants may purchase the "leased premises"  not "the landlord's interest" in the property nor the "fee as burdened by the lease"  for its "true market value." This can only mean the full value of the property itself, and not, as the court has it, only of the interest retained by the lessor. In a factually identical situation in which valuable property was likewise the subject of a highly unfavorable lease, we recently held that the "fair market value" of the parcel for taxation purposes was that of the entire bundle of rights in the land  that is, the value of an unencumbered fee. Bystrom v. Valencia Center, Inc., 432 So.2d 108 (Fla. 3d DCA 1983). There is no reason why the same result should not follow in interpreting an equivalent phrase of the agreement before us.
Indeed, there is every reason why this should be the outcome. A first principle in the art of contract construction is that, wherever possible, courts will try to read an agreement to effect a result which is just and fair  as opposed, of course, to one which is oppressive and inequitable. James v. Gulf Life Insurance Co., 66 So.2d 62 (Fla. 1959); 11 Fla.Jur.2d Contracts § 105 (1979). Under the decision of the court, however, the lessors are required to sell their property for a fraction of its admitted value,[1] with the resulting loss of much of their accumulated equity. On the other hand, although we are, of course, not empowered to relieve the landlords of the consequences of their improvident bargain in fixing the rent, when the cheese has begun to bind the tenants  by virtue of their inability either to use the land because the building burned down or to finance a new one on the security of their leasehold alone  the majority has cheerfully stepped in to allow them to purchase the fee for a relative pittance. And all this manifestly unjust and non-evenhanded set of results has to recommend or support it is a medievalism: no misnamed "equitable"[2] merger of estates may be deemed to occur. From what little I understand of it, I do not disagree with the court's exposition of this recondite doctrine; indeed, I am awe-struck by the legal scholarship which it represents.[3] I just think that it all doesn't, and certainly shouldn't, make any difference. I would reverse.
NOTES
[1] The lease was to Mrs. Lipsky and her husband. Mr. Lipsky died in 1967, and Mrs. Lipsky was the surviving lessee.
[2] A "leasehold estate" is defined as the use and occupancy of the real estate, the value of which arises from the margin of the economic productivity of the property, subject to meeting the terms and provisions of the lease.

A "leased fee estate" is defined as the right to receive the contract rent provided by the lease, the reversion of the real estate at the end of the lease, plus any other benefits, but minus any penalties according to the provisions of the lease.
American Institute of Real Estate Appraisers, The Appraisal of Real Estate, Seventh Edition (1978), pp. 468-69.
[3] The parties agreed that true market value is the equivalent of fair market value.
[4] The parties agreed that the value, under whichever theory of valuation was ultimately deemed appropriate, would be the average of the appraisals as to that theory.
[5] Since the dissenter has been kind enough to express, albeit grudgingly, his awe at the legal scholarship represented by the majority opinion, we would be remiss if we did not express our admiration for the clairvoyance represented by the dissenting opinion. Although the dissenter tells us that it is not just he who is able to immediately grasp the realities of the situation, but that any person of affairs (including himself, we assume) would be able to do so, we think he is too modest. Surely it cannot be that any ordinary person of affairs would be able to see, without the slightest difficulty, that an agreement to purchase the "leased premises" for "true market value" can only mean, as the dissenter says, "the full value of the property itself, and not, ... the interest retained by the lessor." Would not the ordinary among us  for example, businesspeople, lawyers, real estate appraisers  at least pause to wonder whether the true market value of the "leased premises" is its value encumbered by the lease or not? The dissenter's humility is likewise exposed by his extraordinary ability to intuit a result which is just and fair, while he remains untroubled that the result he would reach would be unjust and unfair to the losing party in his scenario.

In the single instance where the dissenter descends from the ethereal world of intuition to the mundane world of law, he refers us to Bystrom v. Valencia Center, Inc., 432 So.2d 108 (Fla. 3d DCA 1983), as controlling authority for his position. But the concern of Bystrom was a property tax assessment which, as the court there acknowledged, must include the totality of the interests of the lessor and lessee in the real property (at 110), whereas the concern of the present case is an assessment of the lessor's interest only.
Finally, although we take comfort in the dissenter's prediction that Bracton, Littleton and Coke would agree with the result we have reached, we trust the dissenter did not mean to slight Benjamin N. Cardozo, who, as the then Chief Judge of the New York Court of Appeals, joined with his illustrious colleagues in William P. Rae Co. v. Courtney, upon which we rely.
[1] The value of the unencumbered fee was estimated at $600,000; in stark contrast, the value of the fee, as burdened by the lease, was $172,000.
[2] I see nothing "equitable" about a rule of law which applies only when it is good for one particular party, and does not when it is not. Jackson v. Relf, 26 Fla. 465, 8 So. 184, 185 (1890) ("When there is no evidence of the intention of the owner in uniting the legal and equitable estates in himself, it is proper to presume that he intended that effect which is the most beneficial to him."); Annot., Merger of estate for years in fee or lesser estate, 143 A.L.R. 93, 107-121 (1943). But see Pujol v. McKinlay, 42 Cal. 559 (1872) (Lessee purchased property at execution sale which he held under a six year lease; court held that, although the lessor's interest in the lease became merged in and terminated by the judgment, it did not have the effect in equity to merge the lessor's interest in the lease because the lessee had redeemed the property at the sale under an agreement with the lessor which made the former a trustee for the latter.)
[3] I am sure that if Bracton and Littleton and Coke had not gone to that great equitable estate in the sky centuries ago, they would all feel the same way.