[No. H000740. Sixth Dist. Oct. 8, 1986.]

SUMMIT INDUSTRIAL EQUIPMENT, INC., Plaintiff and Appellant, v. KOLL/WELLS BAY AREA, Defendant and Respondent.

**COUNSEL**

Timothy J. Ward for Plaintiff and Appellant.

Howell & Hallgrimson, James J. Rowan, Joseph P. DiCiuccio and Mary E. Arand for Defendant and Respondent.

**OPINION**

**AGLIANO, P. J.—**

### I

Summit Industrial Equipment, Inc. (Summit) pursues this appeal in order to reduce the purchase price a panel of arbitrators determined it must pay

to acquire certain realty from Koll/Wells Bay Area (Koll), a California partnership. As the assignee of the tenant's interest in an industrial lease, Summit holds an option to purchase improved realty located in Santa Clara County. A lease addendum provided the tenant with this option to purchase, and also provided that if the parties could not agree on the "fair market value of the Leased Premises," the value would be determined by arbitration. A majority of two on the arbitration panel determined the value to be $1 million while the arbitrator appointed by Summit dissented, fixing the value at $706,600. Summit petitioned the superior court to vacate the arbitration award, and Koll responded by seeking its confirmation. Summit appeals from the judgment entered by the superior court confirming the arbitration award. (Code Civ. Proc., § 1294, subd. (d).) We affirm the judgment.

## II

### *Facts*

Koll acquired the property and constructed 2 industrial buildings with the intent to lease them for about 10 to 15 years. One of the general partners in Koll was a real estate investment trust, which would suffer adverse tax consequences if it sold property within seven years of its acquisition. The property had been offered for lease for about a year when Norm Nason, a commercial real estate broker representing Peterson Tractor Company, approached Koll with an offer to purchase one of the buildings. Koll expressed its disinterest in an immediate sale, but negotiations ensued, with William Benson representing Koll as its development manager. Ultimately, the parties agreed to a lease with an option to purchase.

The original lease was dated February 12, 1976, and incorporated by reference several addenda, which were executed in March, April, and May 1976. The original term was 120 months beginning on May 1, 1976, with rent payable monthly. The tenant was given options to extend the lease for two consecutive five-year periods.

Of particular interest is the provision for the tenant's option to purchase in the first addendum, signed on April 5 and 7, 1976. It states: "23.1 Tenant is hereby granted, and shall have, a one-time option to purchase the Leased Premises at the end of the seventh (7th) year of the Lease Term for the then fair market value of the Leased Premises as such value is determined by the mutual agreement of Tenant and Landlord. To exercise this option, Tenant shall give notice to Landlord in writing of Tenant's intention to do so six (6) months prior to the end of the seventh (7th) year of the Lease. [¶] 23.2 In the event that Tenant and Landlord cannot agree upon the fair

market value of the Leased Premises, such value shall be determined by arbitration as herein provided: [¶] a. *Appointment:* Landlord and Tenant shall each appoint one (1) arbitrator and the two (2) arbitrators so appointed shall select and appoint a third arbitrator, herein referred to as 'the neutral arbitrator'. [¶] b. *Hearing & Evidence:* The three (3) arbitrators so appointed shall promptly fix a convenient time and place in the county in which the Leased Premises are located for hearing the dispute and shall give written notice thereof to Landlord and Tenant at least ten (10) days prior to the date so fixed. The neutral arbitrator shall preside over the arbitration proceedings which shall be conducted in accordance with the provisions of Chapter 3, Title 9 of the California Code of Civil Procedure to the extent not inconsistent with any provisions herein. In the event of any conflict between the provisions of this Article and said Chapter 3, the provisions of this Article shall control. In ascertaining the then fair market value of the Leased Premises, the arbitrators may received [*sic*] testimony and evidence employing any, or all, of those methods of valuation set forth in Sections 815 through 821, inclusive, of the California Evidence Code but shall not hear any matter of evaluation made inadmissible by Section 822 of the California Evidence Code. [¶] c. *Decision & Enforcement:* The award of a majority of the arbitrators shall determine the question arbitrated, and a judgment may be rendered by the Superior Court confirming and enforcing the award."

In 1979, Peterson Tractor Company was interested in moving to a larger building, and coincidentally so was Summit. They entered negotiations which resulted in a written assignment of Peterson's interest as lessee in its lease from Koll, to which Koll consented on January 14, 1980. The assignment was to "Clifford J. Morin and/or Summit Industrial Equipment Co., Inc." Morin is the president of Summit.

By letter dated August 9, 1982, Attorney Timothy Ward asserted the option to purchase on behalf of Summit.

Ultimately, Summit appointed Floyd Clevenger, a real estate broker and appraiser as its arbitrator, Koll appointed Attorney William Elfving, and the two arbitrators chose retired Superior Court Judge Peter Anello as the neutral, presiding arbitrator. The arbitrators heard evidence on June 21 and 23, 1984.

The differences underlying this dispute were presented to the arbitration panel in the introductory remarks of counsel. Summit's view was that the arbitrators were required to establish a fair market value for the premises as though the buyer would acquire the property subject to the existing lease.

Koll's view was that the property should be valued free of the existing lease, since it would merge into the title acquired by the tenant-buyer.

Summit's witnesses offered the following opinions of value, all assuming the property to be encumbered by the lease held by Summit: Clifford Morin, Summit's president, $450,000–$500,000; Drew Arvay, a real estate broker who represented Summit in obtaining the lease assignment from Peterson, $457,371–$480,240; Robert Beatty, a real estate broker who represented Peterson in arranging the lease assignment to Summit, $600,000–$650,000; and Clevenger, $706,600.[1]

Koll's witnesses offered the following valuations, all assuming the property was not encumbered by the existing lease: Desmond Johnson, a real estate broker and appraiser, $1 million; and Bruce Horton, a real estate agent specializing in industrial buildings, $1,010,620. Clevenger, as a witness, also valued the unencumbered fee at $1 million.

The arbitrators also took evidence on what the original contracting parties intended in providing for the tenant's option to purchase. Benson, who represented Koll in the original negotiations with Peterson Tractor Company, testified that the parties intended to value the property unleased, because the tenant's lease would merge into its ownership interest. He further explained that while the lease agreement provided for a possible limited rent increase after its seventh year, this limit was not intended to affect the purchase price. The deposition of Nason, who represented Peterson in the original lease negotiations, was admitted into evidence. His recollection was not as specific as Benson's, but was in accord. Peterson was interested in acquiring the property for its fair value, and did not regard the rent limitations as affecting the ultimate purchase price.

After deliberating on July 5, 1984, the arbitrators made their award dated August 16, 1984. The crucial findings by Anello and Elfving, the majority of the arbitration panel, are: "The evidence establishes that under the original lease the only party that had the right to exercise the option to purchase the property was the original tenant, Peterson Tractors Company, Inc. No third party had the right to purchase the property. The parties to the original lease agreed that if the tenant exercised its option to purchase the property, the tenant would pay the fair market value of the property. [¶] The evidence does not suggest that either the landlord or the original tenant expected to have the fair market value of the property reduced by an amount equal to

---

[1]Koll initially objected to Clevenger serving as both a witness and an arbitrator, but ultimately waived its objection prior to his testimony.

the capitalization of the value of the remaining portion of the lease. The assignee can acquire no greater rights than the original tenant absent a new and different contract. [¶] Furthermore, as a matter of law, when the lessee takes title to the lease property, the leasehold interest will merge into the fee when the title is transferred and at that point the leasehold interest will be terminated. Accordingly, assignee will acquire title without an encumbrance in the form of the original lease. [¶] Therefore, we find that the fair market value of the subject property as of April 30, 1983, is $1,000,000.00. We further find that there should be no reduction of this amount on account of the leasehold interest in the property presently held by the assignee."

Clevenger dissented, writing that the other arbitrators exceeded their power by valuing an unencumbered fee interest, rather than the landlord's interest in the property.

On November 26, 1984, Summit filed its petition to vacate the arbitration award, pressing the same arguments made by this appeal. Koll filed its response on December 17, 1984, seeking confirmation of the award. After a hearing on January 16, 1985, the superior court filed its intended decision on January 23, 1985, confirming the arbitration award. The court reasoned: "Given the fact that the lease merges with the fee upon sale, it was appropriate for the arbitration panel to consider the intent of the parties in determining what they meant by the term 'then fair market value of the leased premises.' The arbitration panel did not exceed its powers or limited grant of authority to arbitrate made in the agreement. A windfall to the Petitioner, and a legal absurdity, would have resulted had the arbitration panel taken into account the 'value' of a future nonexistent leasehold interest in determining fair market value." Summit appeals from the ensuing judgment entered on April 23, 1985.

### III

#### Discussion

The critical question is: when a tenant exercises its option to purchase the leased property before the end of the lease term for its fair market value, should the property be valued as free of, or encumbered by, the lease? Here the original contracting parties provided the tenant with an option to purchase "the Leased Premises" "for the then fair market value of the Leased Premises." Failing agreement by the parties, arbitrators were to determine this value.

The tenant, Summit, takes the position that the arbitrators exceeded their contractually-conferred powers by interpreting the lease-option agree-

ment at all. Under the "clear, certain and unambiguous" language of the contract, their duty was simply to establish the fair market value of the property. ▦ The term "fair market value" necessarily contemplates a valuation method which accounts for an existing lease which encumbers the property. This interpretation is bolstered by the fact that the parties referred to "the Leased Premises," and not, for example, the "subject property" as the arbitrators mistakenly did in their award. In other words, "the Leased Premises" is the equivalent of "the premises subject to the lease."

The position of Koll, the landlord, is that the original contracting parties intended by "fair market value" to employ a valuation which treated the lease as terminated or nonexistent, due to a merger of the tenancy into the ownership interest.

▦ We agree that the submission to the arbitrators was a limited one, but not so limited that the arbitrators, empowered to value the property, could not interpret the contract to determine what property interest they were to value. Even agreement with Summit would require the arbitrators to interpret the contract. ▦ Summit's more substantial contention is that the arbitrators interpreted "the Leased Premises" incorrectly, assigning a value to the wrong property interest.

Neither the parties nor we have discovered any California case precisely on point. We note Civil Code section 1933 provides: "The hiring of a thing terminates: . . . [¶] 3. By the hirer acquiring a title to the thing hired superior to that of the letter; . . ." Under some circumstances a lessee's estate is found to have merged with the lessor's when the same person holds both. (*Erving* v. *Jas. H. Goodman & Co. Bank* (1915) 171 Cal. 559, 563 [153 P. 945].) Moreover, it has been held that a lease terminates and transforms into a contract of sale when a tenant exercises its option to purchase the property. (*Murfee* v. *Porter* (1950) 96 Cal.App.2d 9, 18 [214 P.2d 543]; *State of California* v. *Agostini* (1956) 139 Cal.App.2d 909, 914, 917 [294 P.2d 769]; see *Peebler* v. *Seawell* (1954) 122 Cal.App.2d 503, 506-507 [265 P.2d 109].)

Nevertheless, in *Ito* v. *Schiller* (1931) 213 Cal. 632, 635 [3 P.2d 1], the court stated: "A merger does not always follow the union of a greater and lesser estate in the same ownership. The question is one of intention, actual or presumed, of the person in whom the interests are united, . . . The rule is stated in *Jameson* v. *Hayward*, 106 Cal. 682, 688, 689 . . . 'Equity will prevent or permit a merger, as will best subserve the purposes of justice, and the actual and just intent of the parties. . . . In the absence of an expression of intention, if the interest of the person in whom the several

estates have united, as shown from all the circumstances, would be best subserved by keeping them separate, the intent so to do will ordinarily be implied.'"

In *Ito* the court presumed that a landlord did not intend a merger when he subleased the premises from his lessees, because a merger would have cost him several years of rent under the existing lease. (*Id.*, at p. 636.) The lessees brought an action to recover the subject premises from the landlord who refused to vacate at their request. Since their lease did not merge with the fee upon the owner's reoccupation of the premises, they were entitled to the premises for the unexpired lease term.

The specific question of valuation has been decided in other jurisdictions, from which we may derive guidance. (Cf. *Loral Corporation* v. *Moyes* (1985) 174 Cal.App.3d 268, 278 [219 Cal.Rptr. 836].) In *William P. Rae Co.* v. *Courtney* (1929) 250 N.Y. 271 [165 N.E. 289, 290-291], the court reasoned: "Whether a lease is a burden and an incumbrance of such a nature as to diminish the value of the fee depends upon whether the rent reserved is more or less than the annual value of the premises. . . . If the lessors had desired to sell the premises subject to the lease, they would have been obliged to deduct from the market value of the property the amount of the incumbrance of the lease. [¶] The acceptance of the option by the plaintiff, and its attempt to have the 'proper consideration' fixed by agreement or arbitration, did not merge the leasehold estate in the fee. [¶] Whether in equity there is a merger of a lesser estate in a greater, or an equitable in a legal estate, is largely a question of the intention of the parties, to be gathered to a great extent from the situation of the parties and the surrounding circumstances. . . . [¶] In the absence of an expressed intent, equity will look for and ascertain it from all the circumstances surrounding the parties and the transaction. If it appears to be against the interest of the party acquiring both estates to have a merger take place, then equity will presume that it was his intention that there should not be a merger." The court determined no merger was intended and the unexpired term of the lease should depreciate the "proper consideration" to be paid, because otherwise the tenant would lose the improvements it placed on the property and the benefit of its bargain for low rent.

In *Contos* v. *Lipsky* (Fla.App. 1983) 433 So.2d 1242, 1245-1246, a two-judge majority relied heavily on *William P. Rae Co.* v. *Courtney, supra,* 250 N.Y. 271. There the lease had 26 years to run when the lessee exercised her option to purchase "the leased premises" for a purchase price "'*to be based on the true market value at the time of exercising the option; . . .*'" (*Id.*, at p. 1243, italics in original.) The landlord brought a declaratory relief action asserting the property should be valued as unencumbered by

the lease. The court elaborated on the reasoning in *William P. Rae Co.,* explaining that the rigid rule of automatic merger when a person acquired both a greater and a lesser estate had given way in equity to a flexible rule respecting the parties' actual intent. (*Id.,* at pp. 1244-1245.) The court observed there was a complete absence of evidence on whether the parties intended a merger upon exercise of the option to purchase, and applied the presumption there is no merger intended when it would be inimical to the lessee, as the party acquiring both estates. (*Id.,* at pp. 1245-1246.) The court noted that a merger would require the lessee to pay as much for the property as any third party, involving a loss to her of her favorable lease terms and the improvements made in reliance thereon. The court also pointed out she held a valuable interest as lessee because she was able to sublet the property for $64,000 more a year than the rent she paid. (*Id.,* at p. 1245.)

The dissent in *Contos* considered both the meaning of the agreement and fairness to dictate that the "true market value" meant the full value of the unencumbered fee. (*Id.,* at pp. 1247-1248.)

*TCC Enterprises* v. *Estate of Erny* (1986) 149 Ariz. 257 [717 P.2d 936] faced the question anew. The lessee there exercised its option to purchase the property for its "current market value" with 19 years remaining on its lease. The court reasoned that the landlord was not in a position to sell an encumbered fee, because the property was burdened by a lease. Thus, the property's market value contemplated establishing a value a buyer would pay for the property subject to the lease. (*Id.,* at p. 937.) Since the option also provided that the property value be diminished by the value of the improvements, the court found the parties intended "that the lessee not pay for something already paid for." (*Ibid.*)

The opposite resulted in *Palm Pavilion of Clearwater* v. *Thompson* (Fla.App. 1984) 458 So.2d 893. The lessee there exercised its option to purchase "the property" for its "fair market value" with an unspecified number of years remaining on its lease. The court agreed with the dissent in *Contos,* emphasizing the option spoke of purchasing the "property," not limiting it to "'the landlord's interest in the property' or 'the fee as burdened by the lease.'" (*Id.,* at p. 894.) The court distinguished *Contos* because that court might have found some ambiguity in the term "leased premises." Thus, the court effectively determined the parties intended a merger of the lessee's and lessor's interests upon exercise of the lessee's option to purchase.

These cases can be reconciled on the following principle: when the evidence is found to overcome the equitable presumption that a lessee

or tenant did not intend a merger with the landlord's estate upon exercising an option to purchase the property, then the property should be valued as though unencumbered by the lease.

Assuming this principle applies in the instant case, it appears the uncontradicted evidence was contrary to the presumption. Benson, who participated in the original lease-option negotiations on behalf of Koll, testified that the parties intended a merger and that the property was to be valued as unencumbered. Significantly, Nason, who had represented Peterson Tractor Company in negotiating the lease-option, also substantiated this version of the transaction. Their testimony is credible and consistent with this lease-option being essentially a sale of the property—delayed seven years for tax reasons.

■ Contrary to Summit's contentions, the contract language is reasonably susceptible to this interpretation. ■ Resort to the equitable presumption would have been proper, in the absence of any evidence of the actual intent of the parties. But the evidence of the intent of the original contracting parties in this case is sufficient to overcome the presumption. (Cf. *Hewitt* v. *Meaney* (1986) 181 Cal.App.3d 361, 371 [226 Cal.Rptr. 349].)

Summit's reliance on *State of California* v. *Whitlow* (1966) 243 Cal.App.2d 490 [52 Cal.Rptr. 336], and *County of Los Angeles* v. *American Sav. & Loan Assn.* (1972) 26 Cal.App.3d 7 [102 Cal.Rptr. 439], is misplaced. Both of those cases merely hold that when the government seeks to condemn property it has already leased, it need not pay more than a third party would for property encumbered by a lease. In *Whitlow, supra,* 243 Cal.App.2d at page 494, the court noted that the state had expressly stated in its condemnation complaint that it sought only to condemn the landlord's interest in the property. Any comparison between acquisition through the power of eminent domain and a negotiated option to purchase breaks down, however, because the intent of the parties is hardly a consideration in the context of a forced sale.

The critical question presented to us is whether there was sufficient evidence to overcome the presumption of no merger. We are not faced directly with a question of contract interpretation. ■ It is true that interpretation of a contract presents a question of law unless it depends on conflicting evidence, and an appellate court is not bound by a trial court's interpretation which does not depend on the credibility of extrinsic evidence. (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 867, 402 P.2d 839]; cf. *Estate of Russell* (1968) 69 Cal.2d 200,

213 [70 Cal.Rptr. 561, 444 P.2d 353].) Here the superior court did interpret the contract based on undisputed evidence, and so we may construe it independently of the trial court's determination. ■ However, the question of contract interpretation reaches us in the context of review of an arbitration award.

The public policy favoring resolution of disputes short of litigation is reflected in the statutory scheme governing enforcement and review of arbitration awards. "[T]he court shall confirm the award as made, . . . unless in accordance with this chapter it corrects the award and confirms it as corrected, vacates the award or dismisses the proceeding." (Code Civ. Proc., § 1286.) In the absence of contrary provisions in the arbitration agreement, the statute provides limited grounds for judicial review of an arbitration award. (*Crofoot* v. *Blair Holdings Corp.* (1953) 119 Cal.App.2d 156, 186 [260 P.2d 156]; *Jones* v. *Kvistad* (1971) 19 Cal.App.3d 836, 840 [97 Cal.Rptr. 100]; cf. *Pacific Vegetable Oil Corp.* v. *C.S.T., Ltd.* (1946) 29 Cal.2d 228, 233-234 [174 P.2d 441]; *Morris* v. *Zuckerman* (1968) 69 Cal.2d 686, 691 [72 Cal.Rptr. 880, 446 P.2d 1000].) Summit seeks to have the arbitration award vacated or corrected on the basis the arbitrators exceeded their powers (Code Civ. Proc., §§ 1286.2, subd. (d), 1286.6, subd. (b)), in their interpretation of the contract. In light of the limited scope of judicial review, courts will give greater deference to an arbitrator's contract interpretation than to another court's, interfering only when it exceeds the arbitrator's authority or is "completely irrational." (*Lesser Towers, Inc.* v. *Roscoe-Ajax Constr. Co.* (1969) 271 Cal.App.2d 675, 700-702 [77 Cal.Rptr. 100]; *Jones* v. *Kvistad, supra,* 19 Cal.App.3d 836, 842-844.)

■ ■ The arbitrators and the superior court might have erred in assuming the law provides an automatic merger when a tenant acquires the landlord's property interest, but they properly assessed the evidence and reasonably found that the original contracting parties intended a merger in this case. We find it unnecessary, therefore, to decide when legal error by an arbitrator is subject to judicial review. (Cf. *Abbott* v. *California State Auto. Assn.* (1977) 68 Cal.App.3d 763, 767-771 [137 Cal.Rptr. 580] and cases there cited with *Rodrigues* v. *Keller* (1980) 113 Cal.App.3d 838, 843 [170 Cal.Rptr. 349] and cases there cited.) We perceive no prejudice resulting from this erroneous assumption because there was no legal error in the arbitrators' answer to the critical question.

IV

The judgment is affirmed.

Simmons, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.

**BRAUER, J.,** Concurring.—I concur in the judgment.

The arbitrators were engaged for the purpose of valuing a parcel of property. The only real question was whether or not "fair market value" meant value reduced by an amount equal to the capitalization of the remaining portion of the lease.

Summit argues that the arbitrators exceeded their powers (Code Civ. Proc., § 1286.2, subd. (d)) by answering that question in the negative. Its position is tantamount to saying that the arbitrators were empowered to decide the controversy in Summit's favor but not against it. Were we to accept that contention, it would be difficult to envision an error not rising to the level of acting in excess of the granted powers.

I would decide this case simply with the summary assertion that the stated ground for appeal tenders at worst an error of law and that such an error is not a legal basis for vacating an award. (*Marcus* v. *Superior Court* (1977) 75 Cal.App.3d 204, 210 [141 Cal.Rptr. 890].) By addressing appellant's claim on the merits, we blur the distinction between appellate review of original judicial proceedings and of judgments confirming awards, a distinction which rests on a sound public policy. (*Lindholm* v. *Galvin* (1979) 95 Cal.App.3d 443, 445-452 [157 Cal.Rptr. 167].)

Appellant's petition for review by the Supreme Court was denied December 30, 1986.