Filed 9/28/16  The Vons Companies v. Pride Properties CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE VONS COMPANIES, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> PRIDE PROPERTIES, LLC, <br><br> Defendant and Respondent. | B267337 <br><br> (Los Angeles County <br> Super. Ct. No. BC519967) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert L. Hess, Judge, and Patricia Collins, Judge.  (Retired Judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Reversed.

Buchalter Nemer, Glenn P. Zwang, James B. Wright, and Ivo Keller for Plaintiff and Appellant.

Owens & Gach Ray, Robert B. Owens, and Linda Gach Ray for Defendant and Respondent.

_____

Pride Properties, LLC (Pride) and The Vons Companies, Inc. (Vons) entered into a long term real property lease (the Lease or the Ground Lease) that provides Vons with an option to purchase certain property (the Property), as defined in the Lease. The purchase price under the option is the fair market value of the Property. Vons constructed a supermarket on the premises. When Vons thereafter exercised the option to purchase the Property, the parties disagreed as to whether the purchase price included the fair market value of the supermarket and whether the value of the remaining term of Pride's interest in the Lease should be considered in the valuation.

Each side sued for declaratory relief to obtain a judicial interpretation of the Lease. The parties agreed to have the matter decided by a court-appointed referee pursuant to Code of Civil Procedure, section 638. The referee agreed with Pride that the value of the supermarket constructed by Vons and the Lease must be included in determining the fair market value of the Property. The court entered judgment accordingly. (Code Civ. Proc., § 644, subd. (a).) Vons appealed.

For the reasons discussed below, we interpret the definition of the Property to include only the real property and the buildings and improvements located on the premises at the time the parties entered into the agreement; it does not, therefore, include the later-constructed supermarket. We further conclude that the value of the Property does not include the value of the Lease because, when Vons purchases the Property, the Lease will terminate. We therefore reverse the judgment.

**FACTUAL AND PROCEDURAL SUMMARY**

Pride owns certain real property in Woodland Hills. In 2002, Vons entered into a contract with Pride to purchase a portion of that property for $10.8 million. The largest building, which the parties call "the shops building," on the premises consisted of a cluster of shops that were mostly vacant or occupied by tenants on short-term leases that were about to expire. Vons planned to tear down the shops building and replace it with a supermarket. Before the transaction closed, however, Vons discovered environmental contamination on that property and cancelled the transaction.

2

Vons and Pride thereafter entered into the Lease concerning the Property. The "Effective Date" of the Lease is August 14, 2003. The Property is defined in section 1.1 of the Lease as certain real property (defined in a legal description attached to the Lease) "and all buildings and improvements located thereon." At that time, the shops building, a separate building used as a bank, and a third building used as a restaurant were located on the premises. In addition to leasing the Property to Vons, Pride assigned to Vons certain leases it had with tenants of the buildings.

The Lease has an original term of 21 years following an initial "[f]easibility [p]eriod." The term is automatically extended for up to eight additional five-year terms, unless Vons notifies Pride it is terminating the Lease prior to the expiration of the original term or the applicable extension.

Under section 6.1.1 of the Lease, Vons has the right, at its expense, to "remodel or raze all or any improvements on the Property" and the "option" to construct improvements on the premises, provided that it replace any existing building with one or more improvements of equal or greater value. The parties expressly "acknowledge[d] that [Vons] is currently considering a [s]upermarket [b]uilding that can be constructed wholly on the Property."

Under section 6.2, all "[e]xisting [i]mprovements and all [i]mprovements" Vons constructs on the Property "shall not become a part of the realty even if affixed to the realty but shall remain the exclusive personal property of [Vons] during the Term of this Lease." The phrase, "[e]xisting [i]mprovements," is defined as the three buildings located on the real property at the time the parties entered into the Lease. This section also provides that "[o]n surrendering possession to [Pride], all building improvements then located on the Property shall become the exclusive property of [Pride]."

Vons is permitted to sell or mortgage any improvements it makes to the Property, subject to the terms of the Lease. It is also permitted to sublease "any improvement now or hereafter constructed on the Property."

If the Property is condemned or taken by right of eminent domain, Vons "shall deliver to [Pride] a bill of sale transferring the title to any building improvements on the

3

Property to [Pride]." The parties provided, however, that Vons is entitled to any condemnation award with respect to any improvements Vons constructed, its trade fixtures and equipment, and its "leasehold interest."

Under section 15.1 of the Lease, if Pride remediated the environmental contamination of the Property within three years, it could exercise a "[p]ut [o]ption" requiring Vons to purchase the Property for $13.5 million. Pride did not exercise that option.

Under section 15.2, Vons has the option to purchase the Property no sooner than nine years after the Effective Date of the Lease. The price of the Property is "its '[f]air [m]arket [v]alue' " "determined as of the tenth (10th) anniversary of the Effective Date"; i.e., as of August 14, 2013.[1] If the parties are not able to reach an agreement as to the fair market value within 45 days after Vons exercises the option, the value is to be determined by appraisers in a manner provided in the Lease. Vons can accept or reject that determination. If it rejects the determination, its exercise of the option to purchase is "automatically rescind[ed]."

If Vons accepts the appraisers' valuation, the parties are to enter into an "Agreement of Purchase and Sale," an example of which is attached to the Lease as an exhibit (the Purchase Agreement). In the Purchase Agreement, the "Property" is defined as "all of [Pride's] right, title and interest in the real property and all buildings and improvements located thereon . . . together with all of [Pride's] right, title, and interest in the Ground Lease."[2]

Section 20 of the Lease provides that it "shall not merge into the fee interest in the Property and . . . shall continue in full force and effect unless formally terminated,

[1] If Pride has completed remediation of the environmental contamination, the purchase price shall not be less than $14.5 million.

[2] In their briefs on appeal, both sides assert that the definitions of the Property in the Lease and the Purchase Agreement, although worded differently, are "functionally the same." The referee expressly found that there was "no substantive difference between the two definitions."

4

notwithstanding future ownership by a single party or entity of the fee interest in the Property and the leasehold interest created by [the] Lease."

Finally, section 23 provides that, "[u]nless [the] Lease is terminated as a result of the conveyance of the Property to [Vons] pursuant to [the put option or Vons's purchase option] . . . , upon the expiration or earlier termination of [the] Lease: (a) all improvements upon the Property shall become the sole and exclusive property of [Pride], without payment, credit, or offset to [Vons]."

After entering into the Lease, Vons demolished the shops building and constructed a supermarket building on the premises at a cost of $8.5 million. After building the supermarket, Vons timely exercised its purchase option.

The parties disagreed as to what comprised the Property for purposes of determining the fair market value. In August 2013, Vons filed a complaint requesting a judicial declaration that "the property to be valued for the purposes of the option consists of fee simple title to the land and buildings that existed as of the execution of the Lease, valued as of the tenth anniversary of the Effective Date of the Lease." Pursuant to an agreement between the parties, the court appointed a referee to resolve the dispute.

In November 2014, Pride filed a cross-complaint requesting a judicial declaration that "the Property to be valued is the 'Property' as it is defined in the Ground Lease— namely, 'the real property and all of the buildings and improvements located thereon,' . . . as of August 14, 2013."

In December 2014, Vons filed a first amended complaint in which it asserted that "the property to be valued for the purposes of the option consists only of the land," because the "buildings are not included in the property to be valued since Vons owns the buildings under the [G]round [L]ease."

In February 2015, each side filed a motion for summary judgment before the referee. After a hearing, the referee granted Pride's motion and denied Vons's motion, concluding that "the Lease terms unambiguously define the Property for purposes of establishing the [fair market value o]ption as the real property and all buildings and improvements located thereon . . . together with all of [Pride's] right, title and interest in

5

the Ground Lease." Although this conclusion does not explicitly address whether the "buildings and improvements located thereon" includes the new supermarket, the referee's statement of decision indicates that she agreed with Pride's view that it did. The referee also rejected Vons's argument that the Lease terminates upon its purchase of the Property and that the Property's value should not, therefore, include the value of the rental income Pride will lose when Vons purchases the Property.

After the trial court entered judgment on the referee's decision pursuant to Code of Civil Procedure section 644, subdivision (a), Vons appealed.

## DISCUSSION

Leases are subject to the same rules generally governing contract interpretation. (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521.) The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties as it existed at the time of contracting. (Civ. Code, § 1636.)[3] When a contract is in writing, we ascertain the intention of the parties from the writing alone, if possible. (§ 1639.) We consider the entire contract and construe particular clauses "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (§ 1641.) Although the contract's language, when "clear and explicit," generally governs its interpretation, a "contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (§§ 1638, 1647.) We also interpret the contract so as to "make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (§ 1643.) We will avoid a construction that leads to unfair, harsh, or absurd results. (*Eucasia Schools Worldwide, Inc. v. DW August Co.* (2013) 218 Cal.App.4th 176, 182; *County of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476, 1498.)

Parties to a contract may seek declaratory relief to determine their rights and duties under the contract and, when appropriate, obtain such relief by a motion for

---

[3] All subsequent statutory references are to the Civil Code unless otherwise indicated.

6

summary judgment.  (*Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 52; *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 81; Code Civ. Proc., § 1060.)  We interpret writings and review the grant of summary judgment de novo review.  (*Wedeck v. Unocal Corp.* (1997) 59 Cal.App.4th 848, 855.)

I.      *The Definition Of The Property*

Under section 1.1 of the Lease, the Property is defined as certain real property and "all buildings and improvements located thereon."  Section 15.2 of the Lease provides that Vons "shall have the option to purchase the Property pursuant to the Agreement of Purchase and Sale for its '[f]air [m]arket [v]alue.' "  "[I]ts," in this context, refers to the Property, as defined in section 1.1.

Pride contends that the phrase, "all buildings and improvements located thereon," includes the Vons supermarket that Vons built after the parties entered into the Lease. We disagree.  Contracts, as noted above, are interpreted based upon the intent of the parties "at the time of contracting."  (§ 1636; see *California National Bank v. Woodbridge Plaza LLC* (2008) 164 Cal.App.4th 137, 143.)  At the time the parties entered into the Lease, the Vons supermarket did not exist and could not have been "located thereon."  The intention of the parties, therefore, appears to have been to define the Property to include the buildings and improvements located on the specified real property at the time the parties entered into the Lease; the definition does not include buildings or improvements that were thereafter constructed.

The parties could have easily expressed the meaning that Pride ascribes to the critical phrase by defining the Property to include:  all buildings and improvements located *or hereafter constructed* thereon.  They did not, however, and we may not insert the omitted words.  (Code Civ. Proc., § 1858; *Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 954.)  Indeed, the purposeful omission of words that would have included later construction is evident from the fact that the parties contemplated the possibility that Vons would construct improvements and referred to such future construction in other provisions of the Lease, in some places providing different treatment for improvements that Vons constructs.  They agreed that Vons could (but was not required to) tear

7

down buildings on the real property and construct new buildings (section 6.1.1). They referred to both the "[e]xisting [i]mprovements" and "[i]mprovements *constructed on the Property by* [*Vons*]" (section 6.2) (italics added), and permitted Vons to sublease "any improvement *now or hereafter constructed* on the Property" (section 9.2). (Italics added.) The parties agreed that Vons may sell or mortgage "any improvements, alterations or additions *made by* [*Vons*]" (section 6.4) (italics added), but did not provide Vons with similar rights as to existing improvements. Similarly, in allocating condemnation damages, the parties agreed that Vons was entitled to such damages with respect to "any improvements *constructed on the Property by* [*Vons*]," without mentioning the existing improvements (section 14.2). (Italics added.) Thus, although the parties contemplated that Vons would construct a supermarket and specifically referred to the possibility of future construction throughout the Lease, they did not refer to buildings or improvements *not yet* located thereon in the definition of the Property. When viewed in light of the entire Lease, therefore, the absence of any reference to the contemplated construction in the definition of Property supports an interpretation that the parties intended that definition to include only the buildings and improvements that were located on the real property at the time they entered into the Lease.

Our interpretation of "Property" is also fair and reasonable. Vons paid for the construction of the new supermarket, while Pride contributed nothing. As we interpret the agreement, Pride will still receive the full, fair market value for the land and the buildings that existed on the premises at the time the parties entered into the Lease less depreciation; it will be denied only a windfall payment for a building it never built or paid for. On the other hand, if, as Pride contends, Vons must now pay a price that includes the value of the supermarket, Vons would, in effect, pay twice for the same building—once to construct it, and once to buy it. Pride would receive the entire value of the supermarket, for which Vons paid $8.5 million to build, without contributing anything toward its construction. The result would be unfair and unreasonable.

Pride asserts that including the value of the supermarket in the purchase price is "fair and equitable" because Vons: (1) was not required to build anything on the

real property; (2) has the right to possess the Property for up to 61 years and can terminate the Lease periodically; (3) was not required to exercise the purchase option; (4) is not required to consummate the purchase if it does not accept the appraiser's decision; and (5) "has every possible 'out' of the Lease and for buying the Property." In addition to merely highlighting rights that Vons has under the Lease, these arguments suggest that if Vons did not want to pay twice for the supermarket, it did not have to build it or, having built it, can now decide not to buy the Property. Under the Lease, however, Vons could reasonably expect that it could build the supermarket and later purchase the Property without having to, in effect, pay for the supermarket again. Asserting that Vons need not have built the supermarket or that it could have foregone its right to purchase the Property does not make a purchase price that allows Vons to pay twice for the same building any more fair or reasonable. Nor does it make the windfall Pride would receive any fairer.

Pride's construction is also difficult to harmonize with the parties' use of a fixed price under the put option. If Pride exercised the put option, Vons would have been required to pay $13.5 million for the Property, without any adjustment for anything Vons built. Thus, if Vons did not build a supermarket, the price of the Property would have been $13.5 million; if Vons did build a supermarket, the price would still be $13.5 million. Under the put option, therefore, the existence or nonexistence of the supermarket had no effect on the price of the Property. If the existence or nonexistence of the supermarket had no effect on the *price* of the Property under the put option, reason suggests that the parties did not intend that the future supermarket be included in the *definition* of the Property to be sold under Vons's purchase option.

Pride relies on the provision that, in determining the purchase price under Vons's purchase option, the " '[f]air [m]arket [v]alue' for the Property shall be determined as of the tenth (10th) anniversary of the Effective Date" of the Lease, or August 14, 2013. This unambiguous language, however, merely establishes the valuation date of the Property; it sheds no light on what, exactly, is to be valued as of that date. If the parties desired the definition of the Property to include buildings and improvements located on

9

the real property as of the 10th anniversary of the Effective Date, they could have said so. Because they did not, the rule of construction that contracts be interpreted as of "the time of contracting" controls. (§ 1636.)

Although Vons, in its original complaint, requested a judicial declaration consistent with our construction of the agreement, it went further in its first amended complaint and its motion for summary judgment to assert that the purchase price should not include the value of *any of the buildings* on the real property, even those that were located thereon when it entered into the Lease. It based this argument primarily on section 6.2 of the Lease, which provides that the "[e]xisting [i]mprovements and all [i]mprovements constructed on the Property by [Vons] . . . shall not become a part of the realty even if affixed to the realty but shall remain the exclusive personal property of [Vons] during the [t]erm of this Lease." According to Vons, Pride thus has, at most, a limited, "reversionary interest" in the improvements, which Vons appears to believe is worthless. This interpretation, however, would render the words, "buildings and improvements located thereon" in the definition of the Property effectively meaningless. Because contracts should be interpreted "to give effect to every part" (§ 1641), we reject that interpretation. (See, e.g., *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 957 [an "interpretation rendering contract language nugatory or inoperative is disfavored"].)

Vons's interpretation is also difficult to harmonize with the Lease's distinction between improvements existing at the time of entry into the Lease and new improvements with respect to Vons's rights to sell or mortgage improvements and to receive condemnation damages. The Lease expressly provides that Vons can sell or mortgage the improvements it made, but implies by its silence that Vons cannot sell or mortgage other improvements. Vons also has the right to any condemnation awards with respect to improvements it constructed, its trade fixtures and equipment, and its "leasehold interest." This implies that, with respect to improvements Vons did not construct, it will receive a condemnation award for no more than its leasehold interest in such improvements. These provisions strongly suggest that the parties agreed that Pride

10

should be paid for the improvements that existed at the time the parties entered into the Lease, and that Vons, not Pride, is entitled to money for the sale or condemnation of Vons's improvements. This is inconsistent with Vons's view of what comprises the Property.

Finally, we acknowledge that our interpretation of the Lease, while consistent with the position Vons took in its original complaint, is not currently advocated by either party.[4] Nevertheless, we are concerned with the intent of the parties as expressed in the agreement under an objective standard (*Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1385; *Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 21), not with the parties' post hoc arguments concerning their intent. Based on our review of the Lease, aided by applicable canons of construction, we conclude that the Property to be valued under Vons's purchase option is the specific real property described in the Lease and the buildings and improvements that were located thereon when the parties entered into the Lease. The purchase price under Vons's purchase option shall be the fair market value of such Property as of August 14, 2013, as determined in accordance with the procedure set forth in the Lease and without regard to the value of the supermarket Vons built.

II.     *The Effect Of The Lease On The Determination Of The Property's Fair Market Value*

The referee concluded that the purchase price to be determined under Vons's option includes the value of Pride's right, title, or interest in the Lease. We disagree. Under section 15 of the Lease, the option purchase price is the fair market value of the Property. The word "Property" in section 15 can be reasonably construed only as referring to the same word defined in section 1.1 of the Lease, which makes no reference

---

**4** Pursuant to Government Code section 68081, we requested the parties brief the question whether the phrase "all building and improvements located thereon" should be construed to refer only to buildings and improvements located on the specified real property when the parties entered into the Lease, and not to buildings and improvements thereafter constructed. We have received and considered their responses.

11

to Pride's right, title, or interest in the Lease. Those words are used in the definition of the Property in the *Purchase Agreement*, attached as an exhibit to the Lease. That agreement, however, defines the property that Pride will convey to Vons, but says nothing about how the Property (as defined in the Lease) is to be valued in determining the purchase price.

Nevertheless, the existence of the Lease can affect the fair market value of the Property. As the referee observed, on the date the appraisers are to value the Property, "the real property and the buildings were indisputably subject to the terms of the Lease, which terms necessarily impact the valuation of the [P]roperty. The Lease both added value to the Property, as well as encumbrances thereon." If, for example, Pride desired to sell its interest in the Property to a third party, the price would undoubtedly reflect the fact that the Property is subject to a long term lease to Vons. The analysis is faulty, however, when the purchaser is the tenant. When, as here, a tenant is purchasing the fee interest in the property it is leasing, the parties' intent, if expressed in the agreement, will generally determine whether the leasehold terminates and the two estates are merged. (*Summit Industrial Equipment, Inc. v. Koll/Wells Bay Area* (1986) 186 Cal.App.3d 309, 318-319, disapproved on another point in *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 376-377.) If the parties intended a merger, "then the property should be valued as though unencumbered by the lease." (*Summit Industrial Equipment, Inc. v. Koll/Wells Bay Area*, *supra*, 186 Cal.App.3d at p. 319.)

Here, the parties indicated that the Lease will terminate upon Vons's purchase of the Property pursuant to its option. Section 23 of the Lease provides that certain events will be triggered "[u]nless [the] Lease is terminated as a result of the conveyance of the Property to [Vons] pursuant to [the put option or Vons's purchase option]." This implies that the Lease is terminated as a result of the conveyance of the Property to Vons pursuant to its purchase option. In addition, the Purchase Agreement the parties will enter into if Vons accepts the appraisers' valuation provides that "the Ground Lease shall terminate upon [Vons's] acquisition of the Property pursuant to [the Purchase

12

Agreement].” Based on these provisions, we conclude that the parties intended that the Lease would terminate if and when Vons purchases the Property pursuant to its option.**5**

Pride contends that the Lease would not terminate based upon section 20 of the Lease, which provides that “[t]he leasehold interest created by this Lease shall not merge into the fee interest in the Property and this Lease shall continue in full force and effect *unless formally terminated*, notwithstanding future ownership by a single party or entity of the fee interest in the Property and the leasehold interest created by this Lease.” (Italics added.) As it states, however, this “non-merger” provision applies “unless [the Lease is] formally terminated.” (Capitalization omitted) The language cited above in the Lease and the Purchase Agreement regarding termination of the Lease is sufficient to trigger the exception to the non-merger provision. Accordingly, because the Lease will terminate upon Vons’s acquisition of the Property, the appraisers, in determining the fair market value of the Property under section 15 of the Lease, should not assume its continuing existence.

---

**5** When the mutual intent of the parties regarding merger does *not* appear from the agreement, the interests and intention of the party in whom the interests have ostensibly merged will ordinarily control. (See, e.g., *Ito v. Schiller* (1931) 213 Cal. 632, 635; see generally 5 Miller & Starr, Cal. Real Estate (4th ed. 2015) § 13:53, pp. 13-233-13-234.) Here, Vons—the party in whom the two estates would merge—argues that the parties intended a merger and has presumably determined that merger is in its interest. Thus, even if the mutual intention of the parties was not apparent from the Lease, merger of the two estates would be proper.

**DISPOSITION**

The judgment is reversed.  The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED.

ROTHSCHILD, P. J.

We concur:

JOHNSON, J.

LUI, J.

14