121 So.2d 450 (1960)
FLORIDA SPORTSERVICE, INC., a Florida Corporation, for Itself and for All Other Taxpayers in the City of Miami Similarly Situated, Appellant,
v.
CITY OF MIAMI, Florida, a Municipal Corporation; Robert King High, As Mayor; Robert King High, Fred Davant, George W. DuBreuil, Otis W. Shiver and B.E. Hearn, Sr., As City Commissioners of the City of Miami, Florida, Constituting the Mayor and City Commission of the City of Miami, Florida, and Ira F. Willard, As City Manager, and Frank Correll, As City Clerk, Appellees.
No. 60-126.
District Court of Appeal of Florida. Third District.
June 9, 1960.
Rehearing Denied July 5, 1960.
*451 Aronovitz, Aronovitz & Haverfield, Miami, and Sibley, Grusmark, Barkdull & King, Miami Beach, and Vincent C. Giblin, Miami, for appellant.
Olavi M. Hendrickson and Jack R. Rice, Jr., Miami, for appellees.
CARROLL, CHAS., Judge.
This is an interlocutory appeal from an order entered in a suit for declaratory decree filed in equity, in the circuit court in Dade County.
The suit was brought by the appellant Florida Sportservice, Inc., against the City of Miami, its governing body, city manager and city clerk, seeking a declaration of its rights under a contract relating to concessions at Miami Stadium.
The chancellor ruled that the contract in question had been terminated as of September 30, 1959, and transferred the cause to the law side of the court, for trial and determination of the remaining amount to which the plaintiff was entitled for reimbursement on its investment in improvements under the terms of the contract. *452 It is to that order of the chancellor that the appeal is directed.
A concession agreement was made in 1949 between the appellant Florida Sportservice, Inc., therein called the Concessionaire, Miami Stadium, Inc., therein called the Owner, and Magic City Baseball Club, Inc., therein called the Club. By purchasing the stadium property, the City succeeded to the rights and obligations of the Owner in 1958. The agreement was to be in effect for ten years, until September 30, 1959.
The first question for determination is whether the 1949 contract should be construed to allow the Concessionaire to have an extension of the contract for two additional years because no baseball team was fielded by the Club during two of the ten years, 1954 and 1955. Basically, the agreement provided that if the Owner should not operate the stadium for any year the Concessionaire could have an additional year after the ten. The Owner operated the stadium, but the Club did not field a team in two of the years. The Concessionaire's rights applied not only to the baseball season but to all other activities which should be held on the stadium premises at any time of the year. In each of the two years when there was no regular baseball team playing its home games there, pre-season major league exhibition baseball games were played and one or more special activities were held, and as to those activities, and any others which could have been held, the concessionaire was entitled to and presumably did exercise its concession rights under the contract.
The question becomes one of construction of the contract, as to whether or not, in a year in which the stadium was otherwise open for operation, it should be considered not operated by the Owner for that year because there was no regular baseball play during the baseball season. The chancellor correctly construed the contract when he held that there had been no showing of a failure of the Owner to operate the stadium during the years in question.
The provision of the agreement conferring the concessions was as follows:
"1. Owner hereby grants unto Concessionaire exclusively all concession rights and privileges at and in conjunction with baseball games and other events conducted in or about the premises known as Miami Stadium, including the exclusive right to sell advertising, refeshments, programs, score cards, magazines, newspapers and other periodicals and the exclusive right to operate Owner's rental concessions, subject to the following provisions and exceptions: * * *"
That provision fixing the ten year term, and the disputed provision with reference to a period in which the Owner should fail to operate the stadium were as follows:
"2. The term of this agreement shall be from the date of execution of same to and including September 30, 1959.
"3. In the event Owner shall fail to operate during any year or years of the term herein contemplated, this agreement will automatically be extended for such year or years as shall equal the yearly period or periods of such suspension of operations by Owner."
But there was no agreement by the Owner that any particular events would be held in the stadium, and the contract did not include any covenant by the Owner that baseball would be played there during the regular season, nor was such use of the stadium made a condition of the agreement. The Owner complied with the contract when it made the stadium available and provided operation thereof for such special events as should be held there and for baseball.
Appellants argue that although special events in the non-baseball season could *453 be held in the stadium and were included in the agreement, the use for organized baseball in the regular baseball season was the primary purpose of the stadium and such use was expected to produce substantially more revenue than was anticipated from other events there, and for that reason, although the stadium was open for such other events and was available for baseball, it should be held that the owner did not operate the stadium because the baseball club could not or did not put a team on the field in the two years for which an extension of the contract is sought.
There is some logic in that contention; so much so that it would have been advisable to draw the contract in a manner to so provide. But the contract was not so drawn, and there is no reason why the court should remake an artless contract in order to give it a meaning and efficacy which its ineffective plain wording does not supply. A party who knowingly has entered into a lawful contract which may be improvident as to him generally is not entitled to protection from the courts, which are not free to change his contract for him or to avoid the results thereof. See Duvall v. Walton, 107 Fla. 60, 144 So. 318, 319; Tampa Drug Co. v. West Drug Stores, 112 Fla. 331, 150 So. 786, 789; Squires v. Citrus Fruit Products, Inc., 140 Fla. 253, 191 So. 455, 457; 12 Am.Jur., Contracts, § 184.
The learned chancellor also correctly answered the Concessionaire's second contention, which was that it could insist on a continuation of the lease beyond the ten year period for so long as needed to recapture the unamortized portion of its expenditures for improvements. By the agreement the Concessionaire undertook to install facilities incident to its operation of the concessions in an amount not less than $100,000. It spent approximately $111,000. The agreement provided that the Concessionaire could repay itself for such outlay by withholding 20% of the amounts which should become due from the Concessionaire to the Owner from time to time, and it was provided that if the total of such expenditures were not thus repaid by the end of the term, the Owner was given an election to pay the balance or to permit continued operation for a sufficient time to complete the reimbursement by withholding 20% of the amounts becoming due to the Owner. That provision of the agreement was as follows:
"If upon expiration of the term of this agreement said investment by Concessionaire has not been fully recovered in the manner aforesaid, Owner may either pay to Concessionaire the remainder of said investment, less the cost of putting such facilities, accommodations, fixtures and equipment in a presentable, sanitary and efficient operating condition (due consideration being given to the effect of wear and tear), or in the alternative it may grant Concessionaire an extension of the term of this agreement from year to year until the said remainder of said investment has been fully recovered in the manner provided for in this subparagraph or in subparagraph (d) above.
"When Concessionaire's initial investment in said facilities, accommodations, fixtures and equipment has been fully recovered by Concessionaire by either of the means aforesaid, all of said facilities, accommodations, fixtures and equipment represented by such initial investment and any replacements thereof shall become the property of Owner and Concessionaire shall confirm this fact by executing and delivering to Owner whatever documents may be necessary for that purpose."
In July of 1959, well in advance of the September 1959 expiration date of the ten year agreement, the City by a resolution elected to end the agreement in September and so notified the Concessionaire. The City indicated a desire and intention to pay the balance due the Concessionaire for its said improvements, which was estimated *454 to be in the range of $61,000 to $63,000, and negotiations were entered into between the City and the Concessionaire to fix the amount but no figure was agreed upon.
The appellants take the position that since the City did not actually pay or tender money due to the Concessionaire by the stated expiration date of the agreement, the Concessionaire can force an extension rather than accept payment thereafter from the City. Appellees contend that they were unable to make the payment before the expiration date because the amount due was not known and was not free from dispute, and that all that the City was required to do was to announce its election and be ready and willing to proceed to pay the proper amount when it should be determined.
The City's argument should prevail there. A cursory inspection of the above quoted provision relating to paying the Concessionaire for the unamortized balance due for its improvements, at the end of term of the lease, shows that the City would not be in a position to compute and determine the amount to be paid, and that such balance could be arrived at only by negotiation and agreement. This is so because of the provision of the agreement to the effect that from the amount remaining unpaid there should be deducted "the cost of putting such facilities, accommodations, fixtures and equipment in a presentable, sanitary and efficient operating condition," and which provision, in turn, was limited by the requirement to give due effect to ordinary wear and tear.
Moreover, by the plain language of the agreement it gave an election to the City, and not to the Concessionaire, as to whether the balance due the latter at the end of the term should be paid to it in cash by the City, or through the deduction process under an extension of the lease. The City was entitled to and did make its election in that regard. The fact that it may have been necessary to enter into negotiations to determine the amount due, or if such amount should be in dispute was not material, and the willingness of the City to pay the correct amount when established was sufficient to make its election in that regard an effective one.
The chancellor was eminently correct in denying the equity relief sought, and in making provision for trial on the law side of the court to determine the amount due the Concessionaire as above referred to.
Affirmed.
HORTON, C.J., concurs.
PEARSON, J., dissents.
PEARSON, Judge (dissenting).
I would reverse the interlocutory order appealed because it is my view that there was a suspension of operations at the stadium during the years 1954 and 1955; and that, therefore, because of the provisions of paragraph 3 of the contract involved, the term of the appellant's lease and its concession rights were extended automatically for a period equal to the "periods of such suspension of operations."
The majority opinion adequately sets forth the facts. The provision of the agreement conferring the concessions provided for the extension of the lease, "In the event Owner shall fail to operate during any year or years". The chancellor found that use of the stadium for a few exhibition games and a charity party was a sufficient "operation" to charge the appellants with two years of their ten year contract. I would hold this construction to be against reason. The subject of the contract was a concession agreement ancillary to the operation of a minor league baseball team. The court judicially knows that the regular baseball season extends from April until September. It is apparent that the parties meant that the absence of a baseball team for the regular season would automatically extend the term of the contract. No rule of construction *455 is more important than that, in the absence of a showing to the contrary, words and phrases used in contracts will be given their natural meaning or that meaning most commonly understood when considered in reference to the subject matter and the circumstances. Ehrlich v. Barbatsis Holding Co., Fla. 1953, 63 So.2d 911; Rupp Hotel Operating Co. v. Donn, 158 Fla. 541, 29 So.2d 441.