Dr. Charles E. BURBRIDGE, Appellant,

v.

HOWARD UNIVERSITY, Appellee.

No. 6753.

District of Columbia Court of Appeals.

Argued Feb. 13, 1973.

Decided May 30, 1973.

Columbia Board of Appeals and Review, D.C.App., 287 A.2d 532 (1972).

Richard J. Medalie, Washington, D. C., with whom Jessie M. Harris, Washington, D. C., was on the brief, for appellant.

Dorsey Edward Lane, Washington, D. C., for appellee.

Before KELLY, GALLAGHER and YEAGLEY, Associate Judges.

KELLY, Associate Judge:

This is an appeal from a judgment in favor of appellee, defendant below, in a suit for damages for breach of contract.

Appellant Burbridge had for many years been the Superintendent of Freedmens Hospital. In 1967 the hospital, a federal agency, was transferred by the United States to Howard University, a private corporation, for use as a teaching hospital. Subsequently, on May 5, 1970, the President of Howard University informed appellant by letter that his employment at the hospital would be terminated. Appellant, who had been with the hospital for thirty years and was planning to retire within the year, sought the aid of an attorney to work out some alternative arrangement.

After discussing various alternatives with representatives of Howard University, counsel for appellant sent a letter to the University proposing that appellant be placed in an extended leave status until February 10, 1971 at which time he would retire. The letter defined extended leave status as follows:

> By "extended leave status," it is my understanding that Dr. Burbridge would, in effect, be in the same status as a federal civil service employee on annual leave, except that his leave status would continue until the specified date without regard to his actual annual leave balance.[1]

This offer was accepted verbatim by the University in the form of a letter from its President to counsel for appellant.

The agreement went into effect on July 1, 1970. As of that date, appellant had accrued 424 hours of annual leave. He stopped reporting to work but continued to receive his biweekly paychecks. Personnel records and time and attendance reports initialed by the appropriate officials designated that appellant was on administrative leave.[2] The records reflected that his accumulated annual leave was not being diminished during appellant's absence but rather, the balance increased by eight hours each pay period.

1. R. at 269.

2. A Request for Personnel Action and a Notification of Personnel Action were prepared by the Personnel Department. Employees there were unfamiliar with the term "extended leave status" and after discussion with supervisory personnel characterized appellant as being in an administrative leave status.

On January 14, 1971, appellant submitted to the hospital his application for retirement effective February 10. On February 13, having received no response, he wrote a letter to the Acting Director of the hospital requesting information as to his annual leave balance and terminal pay. He was informed that he had used up all his annual leave and that he would not, therefore, receive terminal pay. He later learned that, on January 29, his original personnel recommendation request was altered so that instead of providing for administrative leave effective as of July 1970, it stated: "Administrative leave approved to begin at the expiration of annual leave."[3] His time and attendance reports were also corrected so that 80 hours of annual leave were deducted from appellant's total in every pay period.

Appellant brought suit in the trial court claiming that Howard University had breached its contract to place him on extended leave, a term he contended was synonymous with administrative leave, and that he was entitled to over $9,000 in damages as terminal pay for his accrued annual leave. Appellee, on the other hand, argued that the contract was unambiguous, and that the term "extended leave status" as defined by appellant's own attorney, the drafter of the offer, was "the same status as a federal civil service employee on annual leave" so that appellant retained no annual leave under the agreement.

At the non-jury trial testimony was received concerning negotiations preceding the contract and the actions of the parties subsequent thereto. At its conclusion the court ruled that the contract was clear and unambiguous as a matter of law and that there was no breach thereof by the University. Alternatively the court held that, should the contract be held to be ambiguous on appeal, as a matter of fact on the basis of the extrinsic evidence appellant had failed to establish by a preponderance of the evidence that he was entitled to recover.

■ Appellant claims that the trial court erred in holding as a matter of law that the agreement was clear and unambiguous.[4] Although he argues that there are three ambiguities in the contract definition of extended leave status,[5] it is established that "[c]ontracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction".[6]

[A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends . . . .[7]

The contract in this case employs neither technical terms nor words of art. "Extended leave status" is not part of the

3. R. at 292.

4. Because of the disposition we make of this case, it is unnecessary for us to discuss the other issues raised by appellant.

5. Appellant contends that the phrase "without regard to his actual leave balance" is ambiguous in that it could be construed to mean "without reduction of" his actual leave balance. He also argues that "actual annual leave balance" is susceptible of two meanings—either his annual leave balance as of July 1, 1970, or his annual leave balance at the time he was placed on administrative leave following the using up of all his annual leave. The third ambiguity he cites is the silence of the contract as to whether he would continue to earn annual leave during his absence although neither party contests this point.

6. Dixon v. Wilson, D.C.App., 192 A.2d 289, 291 (1963), quoting Friedman v. Thomas J. Fisher & Co., D.C.Mun.App., 88 A.2d 321, 323 (1952).

7. 17A C.J.S. Contracts § 294 at 34–35 (1963). [Footnotes omitted.]

standard civil service or personnel vocabulary. The term was coined and defined by appellant's own attorney as meaning "the same status as a federal civil service employee on annual leave, except that his leave status would continue until the specified date without regard to his actual annual leave balance." [R. at 269.]

It seems clear from the above that the agreement provided for appellant to be on leave with pay for the seven months preceding his retirement although he did not have enough annual leave accrued to cover the prolonged absence. The idea that he would be allowed such leave with pay without in any way diminishing his accumulated annual leave is not embodied in the language of the contract.[8]

Moreover, we must disagree with appellant's contention that even if the words of the agreement were clear and unambiguous the parties by their actions placed a different meaning on the terms of the contract. Although it is true that the demonstrated intent of the parties is looked to as a means of interpretation not only when the words are unclear, but also when "both parties assert a positive intent contrary to the words and nobody else is adversely affected by the strange meaning",[9] we cannot hold that such a doctrine is applicable here. While the personnel records prior to their correction reflected that appellant was on administrative leave for the period in question, the record contains substantial evidence to support the finding of the trial court that the manner in which appellee's personnel employees characterized the situation was simple clerical error which did not accurately reflect or alter the meaning placed on the contract by the parties.

Affirmed.

8. Additionally, were we to find that the contract was ambiguous, we would be bound to construe the ambiguity against the party who drafted it. Cowal v. Hopkins, D. C.App., 229 A.2d 452 (1967) ; North Am. Graphite Corp. v. Allan, 87 U.S.App.D.C. 154, 184 F.2d 387 (1950).

9. Kenny Constr. Co. v. Allen, 101 U.S.App. D.C. 334, 336, 248 F.2d 656, 658 (1957) ; Crestview Cemetery Ass'n v. Dieden, 54 Cal.2d 744, 8 Cal.Rptr. 427, 356 P.2d 171 (en banc, 1960).