**NATIONAL TRADE PRODUCTIONS, et al., Appellants,**

v.

**INFORMATION DEVELOPMENT CORPORATION, et al., Appellees.**

No. 96–CV–1595.

District of Columbia Court of Appeals.

Argued Feb. 18, 1998.

Decided April 29, 1999.

Stephen R. Himelfarb for appellants.

Charles Michael Tobin, with whom Rachel Danish Campbell, Washington, DC, was on the brief, for appellees.

Before WAGNER, Chief Judge, and TERRY, Associate Judge, and GALLAGHER, Senior Judge.

WAGNER, Chief Judge:

Appellants, National Trade Productions, Reed Elsevier, Inc., and Reed Properties, Inc. (collectively NTP), appeal from the grant of summary judgment in favor of appellees, Information Development Corporation, William Saxton, and Morris Edwards (collectively IDC), and denying NTP's motion for summary judgment. IDC's complaint was for breach of contract based upon NTP's failure to pay $250,000 which IDC claimed to be due under the terms of the parties' contract. Central to a determination of this dispute is the interpretation to be accorded the contract. The trial court determined that the contract was unambiguous and interpreted it as a matter of law to require payment to IDC of the $250,000 as claimed. On appeal, NTP argues that the trial court erred in granting summary judgment for IDC and in interpreting the contract to require payment absent the occurrence of the contingency which it contends is provided for in the contract. Alternatively, NTP contends that the contract is ambiguous, raising a genuine issue of material fact which precludes summary judgment. We agree with NTP's alternate position that the contract is ambiguous, and therefore reverse and remand for further proceedings.

## I.

National Trade Productions is a corporation engaged in the business of organizing and promoting trade conferences. Appellee, Information Development Corporation (IDC), was engaged in the business of operating and promoting the annual Federal Computer Conference (FCC East Show) in the District of Columbia as well as other computer-related trade events. Appellees, William Saxton and Morris Edwards, are shareholders and officers of IDC. On February 13, 1992, NTP entered into an Asset Purchase Agreement (the Agreement) with IDC and Saxton and Edwards. Under the terms of the Agreement, NTP agreed to purchase "certain business assets, goodwill, tradename, trade and service marks, exhibitor lists and contracts, exhibit space contracts, and other items of IDC, including the FCC shows, and to secure certain covenants from IDC, Saxton and Edwards in exchange for $800,000 plus other valuable consideration." The Agreement also provided that NTP was to make a series of payments to IDC with the last payment of $250,000 due "on or about January 1, 1993 subject to the contingency that contracts executed for the 1993 FCC East Show prior to December 31, 1992 are equal to or greater than 200 booths (+/10%) and NTP has been able to contract for dates with the [Washington Convention Center] for the 1993 FCC East program to be held independently or in conjunction with Fed. Micro." The parties' dispute concerns whether or not NTP was obligated to make the final payment where 200 contracts were not secured as specified. NTP did not pay the $250,000 and IDP filed suit to recover that amount. NTP claimed in the trial court, as it does on appeal, that the condition in the contract required to trigger the payment was not satisfied, and therefore, it was not obligated to pay. IDC argued that the clause relied upon by NTP for its argument addressed only when the money was due, not whether it was due at all.

NTP filed a motion to dismiss on the ground that the contract required the parties to arbitrate the dispute. The trial court denied the motion, concluding that the arbitration clause did not cover the dispute involved here. The parties filed cross-motions for summary judgment. The trial court granted IDC's motion and denied NTP's motion, determining that the contract called for the $250,000 to be paid on or about January 1, 1993. The court agreed with the position of IDC that the condition went only to when the payment was due, and not to whether it was owed.

## II.

NTP challenges the trial court's denial of its motion to dismiss. It contends that the contract provided for mandatory arbitration

of the dispute, and therefore, the trial court should have dismissed the case pending binding arbitration or stayed the proceedings. The trial court denied the motion on February 6, 1996. NTP did not file a notice of appeal from that decision until November 1, 1996.

■ Ordinarily, the denial of a motion to dismiss a complaint is not a final and appealable order. *Hercules & Co. v. Beltway Carpet Serv., Inc.*, 592 A.2d 1069, 1071 (D.C. 1991). "The District's arbitration act, however, creates an exception to this general rule ...." *Id.* If one party to an agreement which provides for arbitration refuses to arbitrate, the other party may move for an order compelling arbitration. *Id.* (citing D.C.Code § 16–4302(a) (1989)). The denial of a motion to compel arbitration is deemed to be a final order for purposes of an appeal. *Id.* (citing D.C.Code § 16–4317(a)(1)). NTP's motion to dismiss was essentially a motion to compel arbitration. *See id.* Thus, denial of the motion was immediately appealable. *Id.* NTP failed to note an appeal within thirty days as required by D.C.App. R. 4(a)(1). Therefore, this court lacks jurisdiction to consider NTP's appeal from denial of its request to compel arbitration. *See Robinson v. Booker*, 561 A.2d 483, 484–85 (D.C.1989).

### III.

NTP argues that the trial court erred in granting IDC's motion for summary judgment and in denying NTP's motion for summary judgment. It contends that either the $250,000 is not due and owing because the contingency provided for in the contract, which is a precondition to payment, has not occurred or that a substantial dispute of material fact exists as to the proper interpretation of the "contingency clause." Alternatively, NTP contends that there is no ambiguity in the contract that renders payment of the amount claimed by IDC subject to a contingency and that the trial court erred in concluding otherwise.

#### a. *Standard of Review*

■ Our review of the trial court's entry of summary judgment is *de novo;* therefore, we conduct an independent examination of the record, applying the same standard as the trial court. *Gryce v. Lavine*, 675 A.2d 67, 69 (D.C.1996) (citing *Young v. Delaney*, 647 A.2d 784, 788 (D.C.1994)). A summary judgment motion is properly granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Id.* (citations and internal quotation marks omitted).

■ In cases involving contract interpretation, whether a genuine issue of material fact is in dispute will depend generally upon whether the contract is ambiguous. *Gryce, supra*, 675 A.2d at 69. Resolution of whether a contract is ambiguous is a question of law, which this court also reviews *de novo*. *Rastall v. CSX Transportation, Inc.*, 697 A.2d 46, 50 (D.C.1997) (citations omitted). "Summary judgment is appropriate 'when the agreement is unambiguous and where there is no question as to the parties' intent.'" *Gryce*, 675 A.2d at 69 (quoting *Bagley v. Foundation for the Preservation of Historic Georgetown*, 647 A.2d 1110, 1113 (D.C.1994) (additional citation omitted)).

#### b. *Contract Ambiguity*

■ A contract is ambiguous "'when it is reasonably susceptible of different constructions or interpretations, or of two or more different meanings.... An ambiguity in a contract raises a genuine issue of material fact' which is for the factfinder to resolve." *Rastall, supra*, 697 A.2d at 51 (quoting *Kass v. William Norwitz Co.*, 509 F.Supp. 618, 623–24 (D.D.C.1980) (citations omitted)); *Gryce, supra*, 675 A.2d at 69 (quoting *Burbridge v. Howard University*, 305 A.2d 245, 247 (D.C.1973) (citations omitted)). "If there is more than one interpretation that a reasonable person could ascribe to the contract, while viewing the contract in context of the circumstances surrounding its making, the contract is ambiguous." *Id.* (citation omitted).

### IV.

NTP argues that the plain meaning of the contract provides clearly that the remaining $250,000 payment was contingent on two events, namely, (1) that the contracts execut-

ed for the 1993 FCC East Show prior to December 31, 1992 are equal to or greater than 200 booths (+/10%) and (2) that NTP has been able to contract for dates with the Washington Convention Center for the (WCC) East Program. The contract provision upon which NTP relies in support of its argument appears under the Heading of "Payment Schedule," Paragraph 2.2.3 of the Agreement. The provision states:

NTP will pay IDC $250,000.00 on or about January 1, 1993 subject to the contingency that contracts executed for the 1993 FCC East show prior to December 31, 1992 are equal to or greater than 200 booths (+/10%) and NTP has been able to contract for dates with the WCC for the 1993 FCC east Program, such program to be held independently or in conjunction with Fed Micro 1993. In the event that NTP decides to co-locate the 1993 FCC East Show with the 1993 Fed Micro Show, the requirement for 200 executed contracts will be reduced by the net reduction, if any, in total booths sold in 1993 to exhibitors who had space in both Fed Micro 1992 and FCC East 1992.

NTP argues that, as stated in the contract, the selling price of $800,000.00, is "subject to the terms and conditions of [t]he Agreement," in this case, the success or failure of the trade shows, as evidenced by the foregoing provision. A fair reading of the quoted clause would be that the payment of $250,000.00 was conditioned upon the success of the 1993 program. NTP's interpretation of the clause is a reasonable one. Other clauses in the contract lend support to the interpretation advanced by NTP. Specifically, paragraph 2.3 provides that "the payment program [is] based upon the success of the 1992 and 1993 FCC East Shows ...." Recognizing this fact, the contract also provides that NTP "will exercise its best, fullest and timely efforts to render each [show] a numerical success and will not abandon or curtail in any way either show except as modified elsewhere." Under the terms of the contract, NTP was purchasing, among other things, "all exclusive rights to assume the exposition dates contracted for by IDC with the Washington Convention Center (WCC) facility for programs to be held in 1992 ... and the dates reserved by IDC with the WCC for programs to be scheduled in 1993, 1994, 1995, and 1996 ... for a total [price] of $100,-000.00." For exhibitor/booth reservations and deposits for the 1992 FCC East Show the price of $200,000 is assigned under the contract, and for the rights to the FCC on-site program, $50,000. It is not unreasonable to read the contingency provision in subparagraph 2.1(h) and the clause indicating that the payment program is based upon the success of the 1992 and 1993 FCC East Shows as conditioning payment upon the realization of a minimum level of success.

Finally, paragraph 2.4, designated "Show Accounting," states: "[w]ithin ten (10) days of the closing of each show, NTP will provide to IDC, or Saxton and Edwards, a *listing of booths floored* and a *reconciliation of monies due* from NTP under paragraph 2.1, certified as accurate by the President and Treasurer of NTP." (Emphasis added.) Given the documentation and reconciliation requirement for determining sums due under the contract, it is reasonable to conclude that payment was to be contingent upon the final number of booths sold. This interpretation is consistent with NTP's interpretation of the contract. Considering the several clauses outlined, which indicate that payment is contingent, a reasonable interpretation of paragraph 2.2.3 is that the $250,000 would not be payable unless the contingency was met, *i.e.*, that a specific number of booths had been contracted for by a certain date. That does not end our inquiry, however, because we must consider whether the contract interpretation advanced by IDC is also reasonable in the context of the circumstances. *See Gryce, supra,* 675 A.2d at 69 (a contract is ambiguous if a reasonable person could ascribe to it more than one interpretation).

IDC proposes a different meaning to the "contingency paragraph" with which the trial court agreed in granting its motion for summary judgment, *i.e.*, that paragraph 2.2.3, upon which NTP relies, goes to the timing of the payment, not the fact of payment. It is IDC's position that based on the contract as a whole, the contingency paragraph addresses only the possible early payment of the

$250,000 and does not provide for a reduction in the total contract price.

NTP's interpretation of the contract provision is also reasonable for a number of reasons. First, paragraph 2.1 states that "the purchase price ... for the Assets and Rights shall be Eight Hundred Thousand Dollars ($800,000.00)." As the trial court pointed out, the subparagraphs of paragraph 2.1, which set forth the purchase price, itemize amounts related to the various components being sold, and none of the components appear to represent the $250,000 balance claimed due by IDC. There is no separate price of $250,000 that clearly represents the amount for the contracts executed for the 1993 show and the reservation of the WCC for 1993. The trial court also found persuasive that subparagraph 2.1(h) of the Agreement could be read to show that the parties intended that "additional payments beyond the $800,000.00 purchase price were to be made if certain numbers of booths were sold in advance of the 1992 and 1993 computer show."[1] Thus, "[s]ubpargraph 2.1(h) ... tends to support the conclusion that $800,-000.00 was the baseline purchase price."

The trial court found significant the fact that the "contingency paragraph" is found in the section of the Agreement designated "Payment Schedule," while the $800,000 purchase price was listed under a section denominated "Purchase Price." In addition, neither in the contingency paragraph nor elsewhere in the contract does it state explicitly that NTP would be relieved of its obligation to pay $250,000 of the total purchase price if the contingencies were not met. For these reasons the trial court interpreted the contingency clause to vary only the date of payment, not the requirement for payment. In other words, if the contingency was not met, the NTP would not be required to make the payment on January 1, 1993, but it would have to pay the $250,000 within a reasonable time to complete the payment of the total purchase price specified in the contract. When the Agreement is considered as a whole, the contingency provision could also be interpreted reasonably as the trial court construed it.

■■■ The trial court erred, however, in determining that the parties' agreement was unambiguous on its face. This interpretation required that the court substitute an alternate date from the date provided in the contract for the payment of the $250,000. The trial court acknowledged that the contract "certainly evidences ... [an] unartful construction" and is "not a model of clarity." The court filled the gap by giving effect to a different time of performance than provided by the contract's plain language. A court cannot "remake an artless contract in order to give it a meaning and efficacy which its ineffective plain wording does not supply." *Florida Sportservice, Inc. v. Miami*, 121 So.2d 450, 453 (Fla.Dist.Ct.App.1960); *Reliable Construction & Realty Co. v. Waterproofing Serv., Inc.*, 34 A.2d 124, 126 (D.C. 1943); *see also Columbia Hosp. v. U.S. Fidelity & Guaranty Co.*, 88 U.S.App. D.C. 251, 256, 188 F.2d 654, 659 (1951). While IDC may put forth evidence at trial that, in fact, there was a reasonable time element to the contract, the court cannot reach that conclusion on the face of this contract.[2]

■■■ Since the parties' agreement is susceptible to two reasonable interpretations, it is ambiguous and gives rise to a genuine issue of material fact which must be resolved at trial by the factfinder. *See Rastall, supra*, 697 A.2d at 51 (citation omitted). Therefore, the trial court erred in granting IDC's motion for summary judgment. For the same reasons, the trial court properly denied NTP's motion. Both parties should be able

---

1. The Agreement provides in paragraph 2.4:
   Show Accounting. Within ten (10) days of the closing of each show, NTP will provide to IDC, or Saxton and Edwards, a listing of booths floored and a reconciliation of monies due from NTP under paragraph 2.1, certified as accurate by the President and Treasurer of NTP.

2. IDC argues that the alternate date was provided for in paragraph 2.4: namely within (10) days of the closing of each show. However, this section refers to the fact that a listing of the booths and a reconciliation statement is due.

to provide evidence to the factfinder as to what the section meant.[3]

For the foregoing reasons, we affirm the denial of summary judgment to NTP and reverse the grant of summary judgment to IDC, and remand to the trial court for further proceedings.[4]

*So ordered.*

3. There are at least four letters from William Saxton, the President to IDC, which indicate that the $250,000 payment might be subject to preconditions. Listed below are excerpts from three of the letters dated as indicated:

December 14, 1992:
Insofar as the Asset Purchase Agreement entered into between NTP and IDC calls for this payment to be based upon contracts executed for the 1993 East show prior to December 31, 1992, I certainly expect that NTP will make every conceivable effort to reach the 200–booth level within the next two weeks.

December 21, 1992:
As you know, the $250,000.00 payment by NTP to IDC depends upon Contracts executed for the 1993 East show prior to December 31, 1992. Therefore, time is of the essence for all parties working toward the goal of booking 200 +/10% booths by this date. So, I am most anxious to have the 1993 FCC information.

January 4, 1993:
Please inform me immediately by FAX or return mail as to how many booths NTP had contracted for the 1993 Federal Computer Conference as of December 31, 1992.. As you know, pursuant to our Asset Purchase Agreement dated February 13, 1992, NTP is to pay IDC $250,000.00 "on or about January 1, 1993" if at least 180 booths were contracted by the end of 1992. If such was the case, I expect that payment forthwith.
Since the contract is ambiguous, this type of evidence may aid in its interpretation.

4. In the trial court, the complaint against the Reed defendants was predicated upon successor liability. NTP argues that it was error to grant summary judgment as to them where there was no evidence that they were successors-in-interest to the assets of NTP. It appears from the record that the liability of the Reed defendants remains for determination in further proceedings.