# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 12, 2024         Decided May 6, 2025

No. 24-7025

ROBERT GOODRICH, INDIVIDUALLY AND IN HIS CAPACITY AS
TRUSTEE OF THE ROBERT D. GOODRICH REVOCABLE TRUST,
APPELLANT

v.

BANK OF AMERICA N.A., TRADING AS U.S. TRUST BANK OF
AMERICA PRIVATE WEALTH MANAGEMENT, AS SUCCESSOR TO
COUNTRYWIDE FINANCIAL CORP. AND MATTHEW LETTINGA,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01344)

———

*Thomas C. Costello* argued the cause for appellant.  With
him on the brief was *Anne L. Preston*.

*Alan L. Rosca* was on the brief for *amicus curiae* Public
Investors Advocate Bar Association in support of appellant.

*Brian D. Schmalzbach* argued the cause for appellees.  On
the brief was *Jodie H. Lawson*.

2

Before: WILKINS, KATSAS and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: Disruptions to supply chains and workforces in early 2020 squeezed financial markets in ways not seen since the 2008 crash. Feeling the angst of that disruption, Plaintiff–Appellant Robert Goodrich liquidated his stock portfolio in March 2020. That decision cost him millions. Goodrich now looks to recoup his losses.

After Goodrich requested the sale, his wealth advisor pulled the proverbial trigger, emptying Goodrich's significant portfolio within hours. Goodrich says he never would have directed his advisor to sell had he appreciated the myriad risks. Unfortunately for him, his investment account contract with his advisor's employer—U.S. Trust Bank of America Private Wealth Management, a division of Bank of America ("BOA")—protects BOA and its agents from liability for actions taken pursuant to an account owner's instructions. And it protects BOA and its agents from liability for breaching any implied duties.

Undeterred, Goodrich turned to the courts, waging an uphill battle against his contract's plain terms: Goodrich sued his wealth advisor, Matthew Lettinga, and BOA (collectively, "Defendants"), in the U.S. District Court for the District of Columbia for gross negligence, breach of fiduciary duty, and violations of the D.C. Securities Act. Because Goodrich's claims are either precluded by contract or implausibly pleaded, we affirm the District Court.

3

**I.**

**A.**

In 2014, Goodrich hired Defendants for private wealth management services. Goodrich signed an "Investment Services Agreement" ("the Agreement"), which gave BOA discretionary authority over his accounts. By signing the Agreement, Goodrich certified that he "received, read, understood, and agreed to" the "Investment Services Terms and Conditions Booklet" ("the Terms"), which the Agreement incorporated. The Terms shield Defendants from liability when acting at an account owner's instruction and disclaim liability for any duties not outlined in the Agreement.[1] Goodrich's investment accounts served as collateral for two lines of credit with BOA, through which Goodrich covered business expenses.

In March 2020, Goodrich began to worry about how the COVID-19 pandemic's effect on financial markets might negatively affect his accounts' cash flow. BOA advised customers (including Goodrich) to patiently ride out the storm, but on Friday, March 20, 2020, the stock market closed at its worst performance since 2008. The following Monday, Goodrich called Lettinga and told him to liquidate his investment portfolio. "Lettinga explained to Goodrich that he would miss some of the upside of an equity market recovery if his portfolio was fully invested in cash and *advised him against liquidating his portfolio*." Appellant's Br. 9 (emphasis added) (citing J.A. 401–02). Lettinga did not, however, explain every potential downside or loss that Goodrich ultimately experienced. Unable to persuade him otherwise, Lettinga

---

[1] BOA updated the Terms in 2020, but the updates had no material effect on the portions relevant to this dispute. *See* Appellant's Br. 29 n.4.

ultimately followed instructions and liquidated Goodrich's portfolio.

The market bounced back almost immediately, much to Goodrich's dismay. The day after the sale, he emailed Lettinga, "When you're right, you're right." J.A. 335, 368. A few weeks later, Goodrich emailed another BOA advisor acknowledging regretfully that Lettinga had followed his instruction. Goodrich does not dispute that he told Lettinga to sell; instead, he disputes whether any such instruction relieved Defendants of liability for inadequately explaining the risks involved. Goodrich alleges that Defendants' failure to explain "the ramifications and/or consequences of selling the investments" caused him to "agree[]" to liquidate his portfolio at great cost. Appellant's Br. 9 (citing J.A. 380).

**B.**

Seeking to recover his losses from the sale, Goodrich sued Defendants in D.C. Superior Court, alleging gross negligence, breach of fiduciary duty, and violations of the D.C. Securities Act. Defendants removed the case to the U.S. District Court for the District of Columbia and moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion for all but the fiduciary duty claim, which proceeded because it hinged on factual questions—the contours of the parties' contractual relationship and whether Goodrich instructed Defendants to sell.

The District Court thereafter requested supplemental briefing on "whether, under [D.C.] law, an explicit instruction from a customer to his discretionary investment manager precludes an action for breach of fiduciary duty." J.A. 58. After concluding that liability turned on such an instruction, the District Court limited discovery to uncovering whether Goodrich explicitly told Defendants to sell.

Goodrich moved to file an Amended Complaint, in which he added back the gross negligence and D.C. Securities Act claims. The District Court granted the motion. Defendants moved to dismiss or (in the alternative) for summary judgment on all claims. The District Court again dismissed Goodrich's gross negligence and D.C. Securities Act claims as implausibly pleaded. Because it found that Goodrich unquestionably instructed Lettinga to sell, the District Court granted summary judgment for Defendants on the breach of fiduciary duty claim. Goodrich timely appealed, challenging the District Court's final orders disposing of his claims and interlocutory orders limiting discovery.

## II.

We review *de novo* orders granting motions to dismiss under Rule 12(b)(6) or granting summary judgment under Rule 56. *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009); *3534 E. Cap Venture, LLC v. Westchester Fire Ins. Co.*, 104 F.4th 913, 915 (D.C. Cir. 2024). Dismissal under Rule 12(b)(6) is appropriate where, taking all factual allegations as true and construing all inferences in the plaintiff's favor, a plaintiff's pleadings do not present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); FED. R. CIV. P. 12(b)(6). Summary judgment is warranted when—accepting the nonmovant's evidence as true and drawing all reasonable inferences in his favor—there is no genuine issue of material fact precluding judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

We review the District Court's "limits on discovery for abuse of discretion," *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 836 (D.C. Cir. 2022) (citation omitted), and overturn the

District Court's "exercise of its broad discretion to manage the scope of discovery only in unusual circumstances," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted). Such unusual circumstances exist only when a challenger can show that the District Court's decision was "clearly unreasonable, arbitrary, or fanciful." *Bowie v. Maddox*, 642 F.3d 1122, 1136 (D.C. Cir. 2011) (citation omitted).

## III.

## A.

We begin with Goodrich's challenge to the District Court's entry of judgment for Defendants on the breach of fiduciary duty claim. "To state a claim for breach of fiduciary duty under District of Columbia law,[2] a plaintiff must allege facts that establish: (1) the defendant owed plaintiff a fiduciary duty; (2) a breach of that duty; and (3) proximate cause and injury [inferable] from those facts." *Xereas v. Heiss*, 987 F.3d 1124, 1130 (D.C. Cir. 2021) (citations omitted). Whether a fiduciary relationship exists is a "fact-intensive question" that focuses on "the nature of the relationship, the promises made, the type of services or advice given and the legitimate

---

[2] The Agreement provides that it is governed by the "laws of the state where the Account is principally administered," and that any suit to enforce its terms "must be brought" in that state. J.A. 99. Although there is no indication that Goodrich's account was administered in the District of Columbia, the parties assume that D.C. law governs the non-statutory issues in this dispute. *See* Appellees' Br. 11–12, 32; Appellant's Br. 14, 20–21. Because choice-of-law issues are waivable and do not bear on our jurisdiction, we adopt the parties' assumption. *See Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 626 n.24 (D.C. Cir. 2017) (per curiam); *Patton Boggs LLP v. Chevron Corp.*, 683 F.3d 397, 403 (D.C. Cir. 2012).

expectations of the parties." *Id.* at 1131 (citation omitted). Contracting parties do not owe "fiduciary dut[ies] beyond the terms of the[ir] agreement." *MobilizeGreen, Inc. v. Cmty. Found. for the Cap. Region*, 267 A.3d 1019, 1026 (D.C. 2022) (internal quotation marks and citation omitted).

The parties do not dispute that investment advisors like Defendants ordinarily owe their clients fiduciary duties.[3] Their disagreement instead turns on whether the Agreement's exculpatory clauses validly limit the duties that Goodrich says the Defendants breached.

**1.**

Goodrich's opening position is that investment advisors, as fiduciaries, may *never* limit their duties. In support, Goodrich cites the Investment Advisers Act ("IAA") of 1940, ch. 686, 54 Stat. 847, 852 (codified as amended at 15 U.S.C. § 80b-6), and the "anti-waiver provisions in the Securities Exchange Act of 1934," which he characterizes as federal laws "aimed at preventing financial institutions from contracting away their fiduciary duties." Appellant's Br. 25. But this Court has no occasion to consider the implications of those laws because, as Goodrich concedes, he "has not brought a

---

[3] Though Goodrich and Amicus devote considerable space to establishing that investment advisors generally owe fiduciary duties, Defendants do not dispute that their status as fiduciaries would ordinarily—but for a contrary contractual agreement—impose corresponding duties. *See* Appellees' Br. 19 ("The question is not whether [BOA] is a fiduciary but whether a fiduciary . . . may limit or define the scope of their duties by contract.").

federal cause of action" under these or other federal statutes.[4] *Id.*

Goodrich also calls our attention to the D.C. Securities Act's anti-waiver provision, D.C. Code § 31-5606.05(i), which voids any "condition, stipulation, or provision that binds a person who acquires a security or asset, or receives investment advice" that "waive[s] compliance with a provision of" the Act. *Id.* He does not, however, identify any provision in the Agreement that is arguably void under D.C. Code § 31-5606.05(i)—until his reply brief. *See* Appellant's Reply Br. 3 (citing D.C. Code § 31-5605.02(d)).[5] Such dilatory arguments are forfeited. *Jones v. Kirchner*, 835 F.3d 74, 83 (D.C. Cir. 2016) ("We apply forfeiture to unarticulated legal and evidentiary theories . . . .") (cleaned up)); *Wilkins v. United States*, 598 U.S. 152, 157 (2023) ("For purposes of efficiency and fairness, our legal system is replete with rules like forfeiture, which require parties to raise arguments . . . at certain times.") (cleaned up)).

---

[4] Nor could he, at least in the context of IAA Section 80b-6, because that Act confers no private cause of action. *See Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 14–15 (1979). And the U.S. Securities and Exchange Commission ("SEC") authority Goodrich relies upon expressly disavows any intent to articulate "the scope or substance of any fiduciary duty that applies to an adviser under applicable state law." Appellees' Br. 21 (quoting SEC. EXCH. COMM'N, COMMISSION INTERPRETATION REGARDING STANDARD OF CONDUCT FOR INVESTMENT ADVISERS 11 n.31 (2019)).

[5] Goodrich quotes D.C. Code § 31-5605.02(d) in a portion of his opening brief setting forth the plain text of "pertinent statutes and regulations," Appellant's Br. 4, but he nowhere develops that statute as a basis for his claims. Such a "skeletal" reference does not preserve Goodrich's final-hour argument. *Cf. Consol. Edison Co. of N.Y. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007).

Amicus likewise fails to persuade us that the parties' relationship is not governed by ordinary contract principles. Indeed, in the case Amicus heralds as most persuasive on this point, *Trumball Investments, Ltd. I v. Wachovia Bank, N.A.*, the Court looked not to public policy or federal statutory law but to state law and the parties' contract in resolving the defendant bank's duties. 436 F.3d 443, 446–49 (4th Cir. 2006).

In sum, we are not persuaded that financial advisors and their clients are prohibited from generally limiting an advisor's fiduciary duties or liability by contract. In fact, the contrary is true—a financial advisor's duty to his client "turns on the application of basic principles of agency law," *Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C. Cir. 1990) (applying D.C. law), which allow "an agent's fiduciary duties to the principal [to] vary depending on the parties' agreement and the scope of the parties' relationship," RESTATEMENT (THIRD) OF AGENCY § 8.01 cmt. c (AM. L. INST. 2006).

**2.**

Having established that ordinary contract principles apply, we turn now to Goodrich's attacks against the Agreement's enforceability. Goodrich argues that to the extent fiduciaries may lawfully limit duties in the abstract, Defendants did not achieve that end here because there was no mutual assent and the Agreement's disclaimer was unclear and ambiguous.

As to mutual assent, Goodrich admits that he signed the Agreement, acknowledging that he "received, read, understood, and agreed to" the Terms. J.A. 67; *see* Appellant's Br. 6. Under D.C. law, a signature is almost always sufficient to show mutual assent. *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995). And that is the case even if the signer was unaware of the terms. *Hart v. Vt. Inv. Ltd. P'ship*, 667 A.2d

578, 582 (D.C. 1995) ("In the absence of fraud or its equivalent, one is obligated by his contract, though signed without knowledge of its terms.") (cleaned up)).  Thus, Goodrich's argument that he did not assent because he did not review the Terms before signing the Agreement falls flat.

Goodrich also argues that the exculpatory clause does not bind him because its terms are unclear and ambiguous.  Under D.C. law, exculpatory provisions are enforceable so long as they do not shield a defendant from liability for "gross negligence, willful act[s], or fraud" and are "clear and unambiguous." *Moore v. Waller*, 930 A.2d 176, 179–81 (D.C. 2007); *Bragdon v. Twenty-Five Twelve Assocs. Ltd. P'ship*, 856 A.2d 1165, 1170 (D.C. 2004) ("[T]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, . . . unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress, or mutual mistake.") (cleaned up)).  Ambiguity exists only when a contract's terms are "reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings." *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983) (quoting *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C. 1973)); *see also Bolle v. Hume*, 619 A.2d 1192, 1196 (D.C. 1993) (quoting *Holland*, 456 A.2d at 815).

There is no disagreement about the substance of the key terms here:

- "The Bank is responsible for the performance of only such duties as are specifically set forth in this

Agreement with no implied duties or responsibilities." J.A. 94.[6]

- "[T]he Bank shall be entitled to rely on written or oral instructions from Owner . . . . Owner will be liable for any losses resulting from [the account] Owner's instructions to the Bank." J.A. 85.

- "The Bank is not liable for actions taken . . . pursuant to . . . [an account] Owner's instructions . . . ." J.A. 95.

Goodrich argues that the first provision—disclaiming liability for implied duties—is ambiguous because it "do[es] not reference fiduciary duties in any way." Appellant's Br. 30. But lack of specificity, particularly when the general (*all* implied duties) necessarily includes the specific (fiduciary duties), does not create ambiguity. *See* RESTATEMENT (THIRD) OF AGENCY § 8.08 cmt. b (explaining that agreements to limit an agent's duty of care may be crafted in "general terms"). Goodrich also submits that the implied-duties waivers are ambiguous because they contradict a clause in the Managed Account Addendum, which supplements the Agreement, and clarifies that the Bank and its agents will not be liable to the account owner "*except for* (1) individual, and not joint, liability for willful misfeasance, bad faith or gross negligence in the performance of their respective duties and obligations under the Agreement, and (2) *any liabilities that cannot be waived*

---

[6] In 2020, this provision was amended to state that "the relationship between the Bank and Owner with respect to the Account is contractual only and governed solely by the provisions of the Agreement to the exclusion of any concepts of tort or common law." J.A. 135. The parties agree this change is immaterial. *Supra* note 2.

*under any applicable state or Federal law, including state and Federal securities laws*." J.A. 104, 110 (emphasis added).

The Addendum's announcement that only lawful waivers protect Defendants from liability does not make the Agreement's implied-duties waivers ambiguous. It merely reflects a bedrock principle of contract law: Contracts are void when they announce illegal terms. RESTATEMENT (SECOND) OF CONTRACTS § 178 (AM. L. INST. 1981); *Carleton v. Winter*, 901 A.2d 174, 181 (D.C. 2006). Construing the Agreement as a whole, the Addendum's text does not alter the plain meaning of the implied-duties waivers or otherwise introduce ambiguity. *See Wilson v. Hayes*, 77 A.3d 392, 402 (D.C. 2013) ("We interpret a contract as a whole, . . . [but] this approach does not permit us to read one provision of a contract as altering the plain meaning of another.").

Finally, Goodrich argues that promotional materials not directly incorporated into the Agreement contradict the waiver by representing that Defendants will act as fiduciaries. But, as explained, the issue presented is not whether Defendants were fiduciaries but whether the Agreement limited their attendant duties. Having found it does, we agree with the District Court that the Agreement is enforceable.

**3.**

We now look for any dispute of material fact that Goodrich instructed Defendants to liquidate his portfolio. We find none.

As Goodrich himself concedes, he "expressed his desire that his investment portfolio be liquidated on March 23, 2020." Appellant's Br. 8. Several pieces of evidence, including Goodrich's contemporaneous statements, put this issue beyond dispute. *See* J.A. 367–68, 438–39. Though Goodrich maintains that this Court should not credit the evidence on this

point, his legal argument "cannot create a triable issue of fact." *Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 529 n.2 (D.C. Cir. 2019) (citing FED. R. CIV. P. 56(c)(1)).

There is no question Defendants liquidated Goodrich's account at his request. Such a request put Defendants' conduct squarely within the scope of the Agreement's waiver. We thus affirm summary judgment for Defendants on the fiduciary duty claim.

**B.**

Goodrich also appeals dismissal of his gross negligence claim.[7] The D.C. Court of Appeals has defined gross negligence as "[t]he failure to exercise even slight care" to the degree it "would shock fair-minded men." *District of*

---

[7] Defendants urge that this claim fails as a matter of law because D.C. law does not recognize a "standalone" claim for gross negligence. Appellees' Br. 32–33 & n.20. Relying on *Atchison v. Wills*, 21 App. D.C. 548, 561 (D.C. Cir. 1903) ("There can be . . . no degrees of negligence . . . ."), several of our district courts have dismissed gross negligence claims as duplicative when brought alongside an ordinary negligence claim. *E.g.*, *Taylor v. United States*, No. 12-cv-894, 2014 WL 2854496, at *2–3 (D.D.C. June 23, 2014); *Hawkins v. WMATA*, 311 F. Supp. 3d 94, 105 (D.D.C. 2018); *Hernandez v. District of Columbia*, 845 F. Supp. 2d 112, 115–16 (D.D.C. 2012). *But see Piedmont Resolution, LLC. v. Johnston, Rivlin & Foley*, 999 F. Supp. 34, 58 (D.D.C. 1998) (recognizing negligence and gross negligence as separate claims). But Goodrich has not brought an ordinary negligence claim. And, as Goodrich points out, the D.C. Court of Appeals has recognized a standalone gross negligence claim where contracting parties waived liability for ordinary negligence. *See Carleton*, 901 A.2d at 181–82. Because the Agreement waives liability for ordinary negligence, J.A. 135, the Court assumes without deciding that Goodrich's gross negligence claim does not fail as a matter of law.

*Columbia v. Walker*, 689 A.2d 40, 44 (D.C. 1997) (quoting *Shea v. Fridley*, 123 A.2d 358, 363 (D.C. 1956)). Such "an extreme deviation" must "support a finding of wanton, willful[,] and reckless disregard or conscious indifference for the rights and safety of others." *Tillery v. District of Columbia*, 227 A.3d 147, 151 (D.C. 2020) (quoting *Walker*, 689 A.2d at 44). "That standard 'connote[s] that the actor has engaged in conduct so extreme as to imply some sort of bad faith.'" *Id.* (quoting *Walker*, 689 A.2d at 44). "Where there is no evidence of subjective bad faith," a plaintiff must show extreme recklessness, evinced by "a risk so obvious that the actor must be taken to be aware of it and so great as to make it highly probable that harm would follow." *Id.* (cleaned up).

As the District Court aptly observed, Goodrich does not allege facts demonstrating bad faith or extreme recklessness. At bottom, his allegations are that Defendants did not explain the contours of every dire or "practical" consequence of liquidation. J.A. 192–98; Appellant's Br. 36. Though Goodrich argues on appeal that Defendants' conduct illustrates a "conscious indifference for [his] financial well-being," Appellant's Br. 15, he concedes that Lettinga told him he was likely to lose money and "advised him against liquidating his portfolio" before the market recovered, *id.* at 9; *see also* J.A. 191. Those concessions are inconsistent with Goodrich's claim that Defendants acted "with deliberate indifference to and in reckless disregard of [their] obligations." J.A. 198.

In the face of contradictory allegations and no evidence of bad faith, we are "not bound to accept" Goodrich's legal conclusions "as true" factual allegations. *Iqbal*, 556 U.S. at

678 (quotation omitted). We thus affirm the District Court's dismissal of the gross negligence claim.[8]

## C.

Goodrich sought relief under two provisions of the D.C. Securities Act, codified at D.C. Code §§ 31-5605.02(a)(1)(A), 31-5606.05(a)(3)(B)(ii), which prohibit and impose penalties (respectively) for using "a device, scheme, or artifice to defraud." J.A. 199; Appellant's Br. 17.

## 1.

The at-issue provisions do not expressly require scienter, and the D.C. Court of Appeals has not squarely decided whether scienter is required. We must thus first determine whether Goodrich was required to plausibly plead scienter. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

As the District Court observed, D.C. Code §§ 31-5605.02(a)(1)(A) and 31-5606.05(a)(3)(B)(ii) mirror the language in SEC Rule 10b-5(a), which proscribes "employ[ing] any device, scheme, or artifice to defraud" another "in connection with the purchase or sale of any

---

[8] Goodrich also argues that the District Court erred in prematurely dismissing his gross negligence claim without expert testimony on the standard of care. The standard of care is certainly a "useful beginning point for analysis" of a negligence claim. *Tillery*, 227 A.3d at 151 (quoting *Walker*, 689 A.2d at 45). But we see no abuse of discretion in the District Court's dismissal without discovery on this issue, especially given that Goodrich did not argue below that standard-of-care discovery was necessary to rule on the gross negligence claim. *See* J.A. 51, 55, 166, 176 (requesting expert testimony but nowhere linking it to his gross negligence claim).

security." 17 C.F.R. § 240.10b-5(a), (c); *see also* 15 U.S.C. § 77q. Rule 10b-5(a)'s scienter requirement was well-established over a decade before the D.C. Council passed the provisions on which Goodrich relies. Because a phrase "obviously transplanted from another legal source . . . brings the old soil with it," *Hall v. Hall*, 584 U.S. 59, 73 (2018) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 537 (1947)), we thus conclude that the D.C. Council intended to import Rule 10b-5(a)'s scienter requirement to the identical provisions on which Goodrich relies.

The plain text underscores our agreement with the District Court. We are guided by the Supreme Court in *Aaron v. Securities & Exchange Commission*, which observed that the phrase "to employ any device, scheme, or artifice to defraud," as it appears in Section 17(a)(1) of the Securities Act of 1934, "plainly evinces" Congress's intent "to proscribe only knowing or intentional misconduct." 446 U.S. 680, 696 (1980). It thus held "that the language of § 17(a) requires scienter under § 17(a)(1)." *Id.* at 697. The Court's conclusion rested on what the words, "device," "scheme," and "artifice" meant in 1934:

> Webster's International Dictionary (2d ed. 1934) defines (1) "device" as "[t]hat which is devised, or formed by design; a contrivance; an invention; project; scheme; often, a scheme to deceive; a stratagem; an artifice," (2) "scheme" as "[a] plan or program of something to be done; an enterprise; a project; as, a business *scheme*[, or] [a] crafty, unethical project," and (3) "artifice" as a "[c]rafty device; trickery; also, an artful stratagem or trick; artfulness; ingeniousness."

*Id.* at 696 n.13. Those words had the same meaning when the D.C. Council passed the at-issue provisions in the Investment Advisors Act of 1992, D.C. Law 9-216, 40 D.C. Reg. 37 (Mar. 17, 1993). *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) (defining (1) "device" as "a scheme to deceive or overreach"; (2) "scheme" as "to devise or contrive a scheme for . . . accomplish[ing] by clever contriving"; and (3) "artifice" as "an ingenious or skillful device or expedient," synonymous with "trick"); WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1990) (defining (1) "device" as "something devised or contrived . . . a scheme to deceive"; (2) "scheme" as "a plan or program," especially "a crafty or secret one"; and (3) "artifice" as "an ingenious device or expedient" and "a clever or artful skill," synonymous with "trick").

Guided by the old soil of Rule 10b-5(a) and the plain text, we hold that plaintiffs seeking relief under D.C. Code §§ 31-5605.02(a)(1)(A) and 31-5606.05(a)(3)(B)(ii) must plausibly plead scienter. We turn next to considering whether Goodrich did so here.

**2.**

Scienter requires allegations of "intentional wrongdoing" or "extreme recklessness." *Liberty Prop. Trust v. Rep. Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009) (citation omitted). Plaintiffs staking their claims on extreme recklessness must show more than "merely a heightened form of ordinary negligence." *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992). To the contrary, they must plead an "extreme departure from the standards of ordinary care, . . . which presents a danger of misleading . . . that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 641–42 (first alteration in original) (quoting *Sundstrand*

*Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

We agree with the District Court that Goodrich did not plausibly allege scienter. Though it recognized that Goodrich repeatedly accuses Defendants of acting in a "reckless, wanton, and willful manner," it found no alleged facts showing an "intent to deceive, manipulate, or defraud" or "an extreme departure from the standards of ordinary care." J.A. 36. The District Court did not need to credit Goodrich's "[t]hreadbare recitals" and "mere conclusory statements" of scienter. *Iqbal*, 556 U.S. at 678.

On appeal, Goodrich argues that these factual allegations constituted "conscious misbehavior or recklessness":

- not "discuss[ing] the proposed transaction with the other BOA team members assigned to Goodrich's accounts" prior to making the sale;

- "fail[ing] to explain . . . the risks and dire ramifications of liquidating the portfolio in the light of the line of credit restrictions"; and

- "exercis[ing] an investment strategy which was in total contradiction of Goodrich's investment objectives."

Appellant's Br. 19 (citations omitted). These acts cross the scienter threshold, Goodrich argues, because Defendants "knew Goodrich would suffer irreversible damages in light of the line of credit restrictions." *Id.* at 19–20 (citation omitted). In support, Goodrich cites two non-binding cases, *Kehr v. Smith Barney, Harris Upham & Co.*, 736 F.2d 1283 (9th Cir. 1984), and *Burman v. Phoenix Worldwide Industries, Inc.*, 384

F. Supp. 2d 316 (D.D.C. 2005), which are unpersuasive and distinguishable.

In *Kehr*, the Ninth Circuit affirmed the lower court's denial of a motion for judgment notwithstanding the verdict in a Rule 10b-5 case because evidence of the plaintiff's "limited education" and ability "to understand the mechanics of sophisticated, speculative investments" was sufficient to support the jury's finding of scienter. 736 F.2d at 1286. Unlike the defendant in *Kehr*, Goodrich was a sophisticated investor. Moreover, the evidence in *Kehr* showed that the defendant affirmatively misled the plaintiff concerning her investment's risk profile, whereas Goodrich has not pleaded that Defendants affirmatively misrepresented any information. In *Burman*, the District Court identified factual allegations illustrating "the falsity of" the alleged misrepresentations, as opposed to "merely stating that this was a false representation," 384 F. Supp. 2d at 333–34, as Goodrich does. These non-binding authorities thus do not cast doubt on our conclusion that Goodrich has not plausibly pleaded scienter.

## D.

Finally, Goodrich asks us to review the District Court's discovery rulings. Defendants urge that the District Court's rulings—distilling discoverable information to the dispositive legal issue—did not constitute an abuse of discretion. We agree.

The challenged orders limited discovery to matters concerning the parties' contractual relationship and Goodrich's instruction. District courts have broad discretion to limit discovery to dispositive issues like these. *See Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 566 F.3d 219, 225–26 (D.C. Cir. 2009). The limits here were crafted after both parties briefed the issue, and they resulted in production of

thousands of pages of documents and Goodrich's deposition of Lettinga. After discovery concluded, Goodrich asked to "conduct additional discovery regarding his assent to the contractual disclaimers relied upon by Defendants" via a court-ordered status report. Appellant's Br. 11 (citing J.A. 174–76). The District Court advised him to formally move for further discovery under Rule 56(d)(2) if he wished to pursue the matter, J.A. 182, which he did not do.

Given all this, the District Court's rulings were anything but "fanciful" and certainly not "clearly unreasonable." *Bowie*, 642 F.3d at 1136. We thus will not disturb them.

\* \* \* \* \*

For the foregoing reasons, we affirm the District Court.

*So ordered.*